**CARTER, State Auditor, v. RATHBURN.**

No. 12585—Opinion Filed March 28, 1922.

(Syllabus.)

1. **Statutes — Appropriation Bills — Veto —Constitutional Provision.**

Section 12, article 6, of the Constitution provides: "Every bill passed by the Legislature, making appropriations of money embracing distinct items, shall, before it becomes a law, be presented to the Governor; if he disapproves the bill, or any item, or appropriation therein contained, he shall communicate such disapproval, with his reasons therefor, to the House in which the bill shall have originated, but all items not disapproved shall have the force and effect of law according to the original provisions of the bill. Any item or items so disapproved shall be void, unless repassed by a two-thirds vote, according to the rules and limitations prescribed in the preceding section in reference to other bills. Provided, that this section shall not relieve emergency bills of the requirement of the three-fourths vote."

2. **Same—General Appropriation Bills— Disapproval of Certain Items—Effect.**

Section 12, supra, was intended to especially provide for the passage of general appropriation bills containing separate, distinct, and independent items, and to give the Governor authority to cut out certain items of such bill by an express disapproval, without affecting the bill in its entirety, but makes no provision by which an item disapproved by the Governor may have the force

and effect of law, except by a repassage of such item, over the Governor's disapproval, by a two-thirds vote as provided in section 11, article 6, of the Constitution.

3. **Same—Disapproval After Adjournment of Legislature.**

Where an item in a general appropriation bill has been disapproved by the Governor, although disapproved after the Legislature adjourned, the Constitution makes no express provision by which such item may be given the force and effect of law, except by a repassage by a two-thirds vote as provided in section 11, supra, and in the absence of a constitutional provision giving such item the force and effect of law, this court has no power to give it such effect.

4. **Same.**

Where a general appropriation bill is passed by both houses and presented to the Governor at 4:20 p. m., and the Legislature adjourns on that day without the Governor having had time in which to act upon the items in such bill, and the Governor disapproves such item after the Legislature adjourns and such item is not repassed by a two-thirds majority as provided in section 11, article 6, of the Constitution, such an item is not a valid appropriation.

5. **Same—Disapproval of Item for Clerk's Salary—Effect on Office Created by Legislature.**

The disapproval of an item for a clerk's salary, the clerkship in question having been created by a separate act of the Legislature, does not have the effect of repealing the law which created such clerkship.

6. **Same—Validity of Appropriation—Veto Powers.**

By this we are not to be understood as holding that the Governor has the right to veto a bill of this character after the Legislature has adjourned, but what we do hold is that the appropriation for this clerkship has not become a law as required by the Constitution. The power to make an appropriation, for which the public must pay taxes, is one of the most sacred rights delegated to legislative bodies, and the law prescribes the exact manner in which such appropriation may be made, and the courts should jealously guard against straining the provisions of law in order to make an appropriation.

Hence, for the sole reason that this appropriation is not made in strict compliance with the law, this court is of the view that it is an invalid appropriation. Not because the Governor has disapproved this item after the adjournment of the Legislature, but simply because it has not become a law as required by the provisions of the Constitution.

Elting and Kennamer, JJ., dissenting.

Error from District Court, Oklahoma County; Cham Jones, Assigned Judge.

Mandamus by Norma Rathburn against F. C. Carter, State Auditor, to compel auditing of claim for salary as state employe. Judgment for plaintiff, and defendant brings error. Judgment reversed, and writ denied.

S. P. Freeling, Atty. Gen., C. W. King, Asst. Atty. Gen., and J. H. Miley, for plaintiff in error.

H. P. Hosey and N. W. Gore, for defendant in error.

HARRISON, C. J. This proceeding was begun in the court below by Norma Rathburn, a clerk in the State Examiner's office, to compel the State Auditor to audit a claim for $125 as salary for the month of July, 1921; and to compel the auditor to carry upon his records an item of $1,500, alleged to have been appropriated by the Legislature as a yearly salary for said clerk for each of the years 1922 and 1923. The district court granted a peremptory writ of mandamus, directing the State Auditor to carry such item of appropriation upon his records. The State Auditor has appealed from such judgment to this court.

The facts are as follows: The Legislature of 1917 provided in chapter 260, Sess. Laws 1917, that the State Examiner should appoint one clerk to act as stenographer, at a salary of $1,200 per year, payable monthly; and in chapter 21, appropriated $1,200 for each of the two succeeding years for such purpose. The Seventh Legislature, in chapter 211, Sess. Laws 1919, made provision for the same office, at a salary of $1,500 per year, and in chapter 274 appropriated $1,500 for each of the two succeeding years. The Eighth Legislature, in Extraordinary Session, in chapter 183, Sess. Laws 1921, in the general appropriation bill, likewise made provision for the same office and appropriated $1,500 for each of the two succeeding years; such provision being made in Senate Bill No. 1 of the Extraordinary Session, which convened April 25, 1921, and adjourned May 21, 1921. Said bill passed both houses of the Legislature and was presented to the Governor for approval at 4:20 p. m., May 21, 1921, the afternoon of the day of final adjournment.

The Governor did not disapprove said Senate Bill No. 1, nor any item therein, nor take any action therein until May 31, 1921, ten days after the day of final adjournment, on which day he wrote, under said $1,500 item of appropriation, the following words: "This item disapproved 5-31-21. J. B. A. Robertson, Governor"—and ran an ink line through the figures "$1,500" in the column of appropriations for each of the years for 1922 and 1923.

On the same day the Governor marked said Senate Bill as follows: "Approved as to all items except those specifically marked disapproved." He also indorsed on said bill his reasons for approving the bill as a whole and for disapproving certain items therein in the following words:

"I am approving this bill knowing that it is unsatisfactory in nearly all of its provisions; many departments will be seriously handicapped because of insufficient funds while a few are given more than they deserve, but because of the manner of distribution, I am unable to veto large sums which these departments do not need. I disapproved several items because they are not needed and because the Legislature failed to follow the recommendations of the Budget Law. The bill is approved, except as to all items specifically marked 'disapproved,' etc. J. B. A. Robertson, Governor." —and on June 3, 1921, he deposited said Senate Bill in the office of the Secretary of State.

In due time plaintiff presented her claim to the State Auditor for $125, as salary for the month of July, 1921, which claim was not allowed and not audited by the auditor on the grounds that the items of appropriation for her salary having been disapproved by the Governor, and not repassed by the Legislature, left no valid appropriation for her salary.

It is agreed by the parties hereto that the only question to be determined is: Whether said item of $1,500 for each of the years 1922 and 1923 is a valid appropriation.

A determination of the above question, however, necessitates a determination of several other questions, among which are: How and when a bill becomes a law? When and how the Governor's power to approve or disapprove shall be exercised, and what effect this failure to either approve or disapprove has upon a bill regularly passed by both houses of the Legislature? These questions are answered by the provisions of our Constitution.

Section 1, article 5, of the Constitution provides:

"The legislative authority of the state shall be vested in a Legislature, consisting of a Senate and a House of Representatives; but the people reserve to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature."

Thus the legislative power of the state is vested in the Legislature, consisting of

a Senate and a House of Representatives; not vested in the Legislature and the Chief Executive. But sections 11 and 12, article 6, of the Constitution confer certain powers upon the Governor, known as the veto powers, and prescribe the manner of exercising such powers. It must be observed, however, that sections 11 and 12, article 6, of the Constitution relate to executive duties, rather than legislative duties. These sections are part of the article on executive departments, but confer certain powers relative to legislation upon the Governor.

It is unnecessary to discuss the underlying reasons which the framers of the Constitution had for conferring such powers upon the Chief Executive, or the motives which may or may not have actuated them in conferring such powers. The fact is that sections 11 and 12, article 6, of the Constitution do confer such powers.

Section 11 provides:

"Every bill which shall have passed the Senate and House of Representatives, and every resolution requiring the assent of both branches of the Legislature, shall, before it becomes a law, be presented to the Governor; if he approve, he shall sign it; if not, he shall return it with his objections to the house in which it shall have originated, who shall enter the objections at large in the journal and proceed to reconsider it. If, after such reconsideration, two-thirds of the members elected to that house shall agree to pass the bill or joint resolution, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered; and, if approved by two-thirds of the members elected to that house, it shall become a law notwithstanding the objections of the Governor: In all such cases, the vote in both houses shall be determined by yeas and nays, and the names of the members voting shall be entered on the journal of each house respectively. If any bill or resolution shall not be returned by the Governor within five days (Sundays excepted) and after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the Legislature shall, by their adjournment, prevent its return, in which case it shall not become a law without the approval of the Governor. No bill shall become a law after the final adjournment of the Legislature, unless approved by the Governor within fifteen days after such adjournment."

Section 12 provides:

"Every bill passed by the Legislature, making appropriations of money embracing distinct items, shall, before it becomes a law, be presented to the Governor; if he disapproves the bill, or any item, or appropriation therein contained, he shall communicate such disapproval, with the reasons therefor, to the house in which the bill shall have originated, but all items not disapproved shall have the force and effect of law according to the original provisions of the bill. Any item or items so disapproved shall be void, unless repassed by a two-thirds vote, according to the rules and limitations prescribed in the preceding section in reference to other bills. Provided, that this section shall not relieve emergency bills of the requirement of the three-fourths vote."

Section 11 above applies to all bills as a whole. That is, bills in their entirety. No bill in its entirety becomes a law without compliance with the provisions of said section. Any bill becomes a law as a whole when such provisions are complied with. The provisions are plain and, in our opinion, need no construction further than that they mean what they say.

But in section 12, supra, recognizing the difference between a bill as a whole and a general appropriation bill containing separate, independent items, the Constitution makes express provision as to how such a bill may become a law. The Constitutional Convention seems to have taken cognizance of the fact that general appropriation bills are necessarily made up of numerous, separate, independent items, and in order to relieve such a bill from the restrictions imposed under section 11, supra, and to free it from danger of being defeated as a whole, made provisions whereby separate items in such a bill may be disapproved and cut out by the Governor, without affecting the bill in its entirety.

In order to make the provisions of said section 12 applicable, a bill must be one making an appropriation of money and embracing separate and distinct items; it must pass both houses and be presented to the Governor; if the Governor disapproves any item thereof, he must communicate his disapproval, with his reasons therefor, to the house in which the bill originated, and all items not disapproved shall have the force and effect of law according to the original provisions of the bill and every item so disapproved is void; that is, does not become a law unless such item is repassed by a two-thirds vote, as provided in section 11, supra. In other words, if an item in a general appropriation bill is disapproved by the Governor, there is no law provided in the Constitution by which it may become a law, except by repassage by a two-thirds vote, as provided in section 11, supra.

It is contended by the plaintiff that the item as to her salary was not "so disapproved." That is, was not disapproved and sent back to the house in which it originated

with such disapproval and reasons therefor while the Legislature was in session, and that by not "so disapproving" such item, that is, by not disapproving same and sending it back to the house in which it originated, the act of disapproval had no effect on the item. In other words, it is contended that, unless the Governor disapproves an item in a general appropriation bill and sends it back for repassage before the Legislature adjourns, the act of disapproval has no effect upon the item and that it becomes a law notwithstanding his disapproval, if he waits until after the Legislature adjourns before indorsing his disapproval thereon.

It is plain that section 12 does not contemplate that the Governor will withhold his approval until after the Legislature adjourns; it provides that if the Governor disapproves any item, he shall return it to the house in which it originated, and contemplates that this will be done while the Legislature is in session, and provides that no item so disapproved shall become a law unless repassed by a two-thirds vote. But we have here an item that is not disapproved before the Legislature adjourns and not sent back to the house in which it originated with the Governor's disapproval and objections. Such a condition as this does not seem to have been provided for in the Constitution, yet such is the condition which confronts us. We have here a general appropriation bill consisting of numerous, separate, distinct items. The bill was presented to the Governor before adjournment of the Legislature. The Governor took no action upon it until after the Legislature had adjourned, but kept it in his possession until after adjournment, and then disapproved the item in question. The Constitution makes no express provision for such a condition, nor any specific provision whereby an item may become a law under such condition. Hence, to give such item the force and effect of law, we must do so without any express authority from the Constitution.

This exact question has never been before this court. It is contended, on behalf of plaintiff in error, that the case of Regents State University v. Trapp, 28 Okla. 83, 113 Pac. 910, applies and should govern the decision in this case, but the exact question involved in this case was not involved in Regents, etc., v. Trapp. The two paragraphs of the syllabus in said case disclose the question which the court had before it and the decision of the court upon such question; said syllabus being as follows:

1. "Section 12, article 6, Constitution, providing that the Governor may disapprove any item of a bill making appropriations of money embracing distinct items, does not apply to a special appropriation bill containing only one item of appropriation for the support and maintenance of the State University; and the act of the Governor approving the bill in part and disapproving other parts thereof, directing how the funds appropriated shall be appropriated, is a nullity."

2. "Senate Bill No. 268, Sess. Laws 1909, having been presented to the Governor less than five days before the adjournment of the Legislature by which it was enacted, and not having been approved by the Governor within 15 days after the adjournment of said Legislature, never became a law."

The controversy in that case arose from the fact that the Governor interpreted section 1 of the bill in question as one of several distinct items in an appropriation bill, and disapproved such item on the theory that section 2 contained other items of appropriation which he did not formerly disapprove, but the court regarded the item of appropriation in section 1 of said bill as the only item of appropriation in the entire bill and held that a disapproval of that item had the effect of vetoing the bill in its entirety. The court said:

"The bill in the case at bar does not embrace distinct items of appropriation; it embraces a single item, with directions how that item shall be expended, together with directions as to how other items of appropriations made by other acts of the Legislature shall be apportioned and expended. The Governor's power to approve or disapprove same therefore is not derived from section 12, article 6, of the Constitution, but from section 11, supra. Under that section, since the bill was presented to the Governor less than five days before the adjournment of the Legislature, approval of the whole bill by him was necessary within 15 days after its adjournment, in order for it to become a law. This he never did. But, since he was without authority thus to approve the bill, his sanction of parts of the bill was ineffectual to give those parts the force of a law. Whether, if the Governor had understood his powers relative to the bill differently he would have approved the whole bill, including those items disapproved by him because in his judgment they were excessive, can only be conjectured. What he did do is a matter of record. He did not approve the entire bill, but specifically disapproved portions of it. It follows that the bill never became a law; and that the State Auditor is without authority and under no duty to draw warrants upon the fund purported to be appropriated thereby. The relief sought by plaintiff is denied."

In the case at bar the question is different. The item in question here is one of many separate, independent items in a general appropriation bill and presents a different ques-

tion to the one presented to the court in the Trapp Case, supra.

The exact question presented here has been before the Supreme Court of West Virginia in two cases, to wit: May v. Topping, (W. Va.) 64 S. E. 848, and Woodall v. Darst (W. Va.) 77 S. E. 264; and section 12 of our Constitution being identical with the West Virginia Constitution, the decisions of that court upon the identical question presented here should be strongly persuasive with this court. The Supreme Court of West Virginia, in the case of May v. Topping, supra, delivered a very exhaustive and closely reasoned opinion; the conclusion in such opinion being that the disapproval of an item in an appropriation bill by the Governor must be done in the strict, technical manner prescribed by the Constitution in order to affect such item; that is, that if an item in an appropriation bill is objectionable to the Governor, he must disapprove it while the Legislature is in session and must send the bill back to the house in which it originated with his objections and reasons for disapproving it set forth while the Legislature is yet in session, and that unless his disapproval be exercised in this technically exact manner, his approval has no effect upon the item; that unless he exercises his disapproval in such manner, then the item is not "so disapproved" as contemplated by the Constitution and becomes a law regardless of his disapproval. The reasoning of the learned Justice who delivered the opinion in said case is very clear and forceful throughout, and to an extent, at least to a certain point or stage in the question presented, is, we think, both forceful and sound, namely, to the extent that the Constitution clearly intends that the Governor shall exercise his power of disapproval of an item while the Legislature is still in session. Up to this point the opinion is in clear harmony with the Constitution; but when the court went further and held that an item, though disapproved by the Governor, still has the force and effect of law, unless disapproved while the Legislature is in session, we think, it was supporting its conclusions by a mere process of reasoning, rather than by expressed provisions of the Constitution. The Constitution does not expressly say that, unless the Governor exercises his disapproval while the Legislature is in session, his disapproval will have no effect upon the item in question, nor does it expressly say that any item not disapproved until after adjournment shall become a law. It says, "But all items not disapproved shall have the force and effect of law. * * * " But does not say that any item not disapproved until after the Legis-

lature has adjourned shall have the force and effect of law.

True, the Constitution says, "Any item so disapproved shall be void," and probably true that the phrase "so disapproved" means disapproved while the Legislature is in session, but it does not say that unless it is "so disapproved" it shall have the force and effect of law. And to give such item the force and effect of law is to do what, we think, the Supreme Court of West Virginia did, put life into it by a process of abstract reasoning rather than by the plain language of the Constitution.

Courts are necessarily vested with the authority to interpret the law and say what it means after it becomes a law. Also they have power to determine that an act has not become a law where constitutional requirements have not been met, but it was never intended that by a mere process of reasoning, however plausible, courts may breathe life into an act which has not been given life by the plain creative provisions of the Constitution.

The item in question was disapproved by the Governor, and, although disapproved after adjournment of the Legislature, the Constitution does not say that because of such fact it shall have the force and effect of law. The court cannot say more than the Constitution has said. Had the Constitutional Convention intended that unless an item were disapproved before adjournment it should have the force and effect of law, and that disapproval of an item after adjournment should have no force or effect upon the item, it could have easily said so. It may have had reasons for not saying so. Whether there were reasons for not saying so is not the court's concern. The fact is that it has not said so and for the court to say the item in question here has the force of a law is to say what the Constitution does not say.

And, furthermore, on the question as to when the Governor shall exercise his disapproval, and how he shall exercise it, and the time within which he is required to exercise it. While the Constitution clearly implies that he shall do so while the Legislature is in session, it just as clearly implies that the Legislature shall remain in session until the Governor has had a reasonable time in which to examine and inspect a general appropriation bill and to exercise his disapproval, if he feels it his duty to do so.

The Constitution says that an appropriation bill embracing distinct items shall be presented to the Governor, and if he disap-

proves it, he shall communicate his disapproval to the house in which it originated. This clearly contemplates that the Legislature will be in session at the time it is presented, and implies that it shall remain in session until the Governor shall have had reasonable time in which to examine and inspect the items of a general appropriation bill. It does not contemplate that the Legislature may load an appropriation bill with unnecessary and objectionable items and then run away before the Governor has time to act.

We are not saying that the item in question, or any other item in the appropriation bill, was unnecessary or objectionable. It is very probable that the appropriation in question would have been conducive to better service in the state departments had it become a law, but this is a question in which the court has no voice. We are not censuring the Legislature, nor the Governor. It is not the court's province to do so, but we do say, in answer to some of the arguments which have been made, that just as great a detriment to the state's interest could be caused by the Legislature loading an appropriation bill with unnecessary items of appropriation and adjourning before the Governor had time to examine them, as it has been argued that the Governor could cause by withholding his disapproval until after adjournment. It has been argued that the Governor would be empowered to abolish the important departments of state by disapproving the appropriation therefor after the Legislature had adjourned. But if such a condition be at all possible, the answer to it is that the same condition could be brought about by the Legislature overloading an appropriation bill with reckless expenditures and immediately adjourning before the Governor had any time to examine items therein. But the Constitution does not presume that such dire conditions will be brought about by either the Legislature or the Governor. The Constitution presumes that all the departments of the state will do their duty, and such is the presumption which this court will indulge.

As to the question of relative responsibility in such matters, we should look to the Constitution itself and be guided by reason, for both combine to place the same responsibilty upon the one that is placed upon the other, the same obligation upon the one that is placed upon the other. The Governor should act with reasonable promptness and be actuated by a high sense of duty. The Legislature should give him reasonable time within which to act and it should be actuated by the same sense of duty.

But, aside from every course of reasoning, the stubborn facts in the case are that we have an item which has been expressly disapproved by the Governor, and has not been repassed by a two-thirds vote as provided in section 11, supra, and the Constitution makes no provision by which such item may be given the force and effect of law, except by a repassage as provided in said section 11.

It is our opinion that, as the Constitution does not give such item the force and effect of law, this court has no power to do so.

By this we do not mean that the Governor has power to repeal a law already in force. We do not hold that, by a disapproval of an appropriation for clerkship the Governor may repeal the act which created the clerkship. The Governor may disapprove an appropriation made for clerkship, but he cannot repeal the law creating the clerkship. The clerkship in question was created by chapter 260, Sess. Laws 1917, and is yet in full force and effect. Each successive Legislature since 1917 has made an appropriation for such clerkship and such appropriations have heretofore not been disapproved, and the fact that the Governor has disapproved the item of appropriation made by the last Legislature does not repeal the clerkship, but leaves it in full force as created by the act of 1917. To illustrate what we mean, this clerkship is provided for by statute, and if it were filed by a clerk until the convening of the next Legislature and the next Legislature should make appropriation to pay same, which it has authority to do, the only effect it would have would be to deprive such clerk of her pay until the Legislature met and made another appropriation for her salary. The clerkship is there, created by statute, and has not been abolished, but the Governor has disapproved the item of appropriation for same, and the Constitution makes no provision by which such item may become a law, except by a repassage, as provided in section 11, supra.

By this we are not to be understood as holding that the Governor has the right to veto a bill of this character after the Legislature has adjourned, but what we do hold is that the appropriation for this clerkship has not become a law as required by the Constitution. The power to make appropriations, for which the public must pay the taxes, is one of the most sacred rights delegated to legislative bodies, and the law prescribes the exact manner in which such appropriations may be made, and the courts should jealously guard against straining the provisions of law in order to make an appropriation valid.

Hence, for the sole reason that this appropriation is not made in strict compliance with the law, this court is of the view that it is an invalid appropriation. Not because the Governor has disapproved this item after the adjournment of the Legislature, but simply because it has not become a law as required by the provisions of the Constitution.

Wherefore, the judgment of the lower court is reversed and the writ denied.

PITCHFORD, JOHNSON, and MILLER, JJ., concur; KANE and McNEILL, JJ., concur in the conclusion; ELTING and KENNAMER, JJ., dissenting.

ELTING, J. (dissenting). The writer of this opinion feels impelled to make this formal dissent from the opinion of the majority of the court for the reason of the importance of the question involved, and, secondly, by reason of our sincere and radical differences with the majority opinion.

We are called upon in this case for the first time to decide the particular question involved herein, and it is a very important constitutional question. A written Constitution is the highest expression of the sovereign will of the people. The very life and spirit of our government centers around the written Constitutions of the federal government and of the various state governments. The mother and model of our Constitution is the federal Constitution. William E. Gladstone, the great English statesman, paid the following tribute to our federal Constitution:

"The greatest work ever struck off at a given time by the genius or purpose of man."

In the case of Frantz et al. v. Aultry, 18 Okla., on pages 612-615, among the many comments and tributes paid to the state Constitutions, are found the following: The Supreme Court of Indiana in the case of In re Denny, 156 Ind. 104, 59 N. E. 359, said:

"In our system of government, a written Constitution is the highest expression of law; none other emanates directly from the sovereign people themselves. It is the deliberate and affirmative utterance of the sovereign majority."

In Taylor v. Governor, 1 Ark. 27, it is said:

"What is a Constitution? The Constitution of America is the supreme, organized and written will of the people acting in convention and assigning to the different departments of the government their respective powers. It may limit and control the ac-

tions of these departments, or it may confer upon them any extent of power not incompatible with the federal compact. By an inspection and examination of all the Constitutions of our own country, they will be found to be nothing more than so many restrictions and limitations upon the departments of the government and the people."

This last quotation we are inclined to criticise because it uses the words "restrictions and limitations" upon the departments of government, having reference, we suppose, to the executive departments of the government, which have no powers except what are granted to them. They need no restrictions and limitations, because their powers go no scintilla beyond the grant. Because the powers not granted press upon and limit and restrict the granted powers. In the 8 Cyc. 717, the doctrine is stated as follows:

"A state Constitution consists of a number of fundamental laws passed by, and alterable and repealable alone by the people; it is superior to the will of the Legislature, the validity of whose acts is determined by its provisions."

We cite these from among the number of quoted selections given in the above cited case of this court, to show the place that written Constitutions of our federal government and various commonwealths are given in our system of representative government. They are the woof and warp of our political system. They are the anchor that holds stable the functions and activities of our system of government. Hence the importance of having as definite, certain, and fixed Constitutions as it is practicable and possible to have. The application and measurements of acts of the government by standards of the Constitution are as important in promoting the stability of our government as are the standards of measurement, standard of weight, and standard of value in trade and industry. When a government breaks from its constitutional anchors it is at once adrift upon the sea of political expediency without a chart or compass and helpless before every wind and storm of fickle and popular passion.

This case involves the interpretation of sections 11 and 12 of article 6 of our state Constitution, and pertains to the scope of the governor's veto power as defined in said sections.

The Constitution does not grant any powers to the Legislature. The Constitution only limits and restricts those powers. All legislative power is originally in the

people and their Legislature. It inheres originally in the people, and does not depend for its existence upon written Constitutions. The people by their Constitutions have placed upon themselves and their legislative bodies just such limitations as are provided in their Constitutions, and all other powers not so limited are reserved to the people.

Not so with the executive departments of the government. The executive departments of the government have no inherent power. Their power comes from the specific grant of power by the Constitution and those arising therefrom by necessary implication. The power of the Governor as to vetoing legislation passed by the state Legislature must be determined by the grant of veto by the veto provisions of the Constitution. It extends no further than those grants, and, to repeat, is limited and circumscribed by the relevant provisions of the written Constitution, and those provisions must be strictly construed against the power. We quote the following from the case of People v. Board of Councilmen, 20 N. Y. Sup. 52-54. The quotation is long, but is important, as it gives a short and succinct history of the growth of the veto power, and closes by giving the rule of strict construction:

"In disposing of this question a consideration of the veto power, its history, purpose, and growth, may aid us in arriving at a correct solution. The word 'veto' is of Latin extraction, and, literally translated, reads: 'I forbid,' or 'I deny.' Those words have a singularly ominous sound when they are applied in a democratic government, and at once call attention to the fact, and challenge the authority. There are, in constitutional governments, two fundamental theories upon which the grant of the power to veto rests: First, to preserve the integrity of that branch of government in which the vetoing power is vested, and thus maintain an equilibrium of governmental powers. Second, to act as a check upon corrupt or hasty and ill-considered legislation. These theories have entered into all debates touching the power. The right, when given at all, is usually lodged in the executive branch of the government. Rome vested it in the tribunes, and the salutation 'I forbid,' pronounced by a tribune, stationed at the door of the Roman Senate, meeting a bill, nullified it. The Crown, in England, possesses the same power. French philosophers exhausted their learning and ingenuity upon the Constitution of 1791, and saw it fall apart for the reason, among others, that the king possessed the power of suspension of legislation, unless adopted by three successive assemblies. The Spanish King might twice refuse his sanction to the action of

the Cortes before it could find a place in the law, under the Constitution of 1812; and the Norwegian Constitution of 1814 was like it in this respect. The early colonial Legislatures felt the same power both from Crown and Governor, for it was the practice of the latter to have money orders in his favor injected into or accompanying bills to be signed, so that he might receive the former at the time or before he signed the latter, which accompaniment was much preferred; while the grievance against the Crown found expression in the declaration: 'He has refused his assent to laws the most wholesome and necessary for the public good.' It was thought by Blackstone that this absolute power of veto was needful for equilibrium, and so he wrote: 'Here, then, is lodged the sovereignty of the British Constitution, and lodged as beneficially as is possible for society; for in no other shape could we be so certain of finding the three great qualities of government so well and so happily united. If the supreme power were lodged in any one of the three branches separately, we must be exposed to the inconveniences of either absolute monarchy, aristocracy, or democracy, and so want two of the three principal ingredients of good polity,—either virtue, wisdom, or power. If it were lodged in any two of the branches, for instance, in the King and House of Lords,— our laws might be providently made and well executed, but they might not always have the good of the people in view: if lodged in the King and Commons, we should want that circumspection and mediatory caution which the wisdom of the peers is to afford; if the supreme rights of legislature were lodged in the two houses only, and the King had no negative upon their proceedings, they might be tempted to encroach upon the royal prerogative, or perhaps to abolish the kingly office and thereby weaken (if not totally destroy) the strength of the executive power. But the constitutional government of this island is so admirably tempered and compounded that nothing can endanger or hurt it by destroying the equilibrium of power between one branch of the Legislature and the rest.' Bl. Comm. (Chase) 17. It is to be noticed in this connection that the British Constitution makes the Crown a constituent part of the Legislature, which does not find place in this government. The truth of the statement that one generation has not foresight sufficient to legislate for the next finds vivid confirmation from this quotation, for it remains as the fact that since 1692 the right of veto by the Crown has not been exercised, and it is asserted by some writers that its exercise at this day would lead to a revolution. The veto power was regarded with great distrust and disfavor by the framers of our government, both state and national, and its right of exercise is by no means universal now. Only one of the original state Constitutions—

Massachusetts—gave even a qualified veto, while the Articles of Confederation withheld it entirely, reaching the other extreme of requiring the assent of nine states to important acts of legislation; thus giving to a minority of five states an absolute right of veto. The happy solution of this question by the framers of the federal Constitution had for its basis the integrity of the executive branch of the government, and very little consideration was given to the theory of a check upon ill-considered and hasty legislation. As late as 1884, and, so far as I possess information, at this date, Delaware, North Carolina, Ohio, and Rhode Island still withhold the veto power from the executive; while in eight others a majority vote of the whole number of members elected to the Legislature constitutes all that is required to override a veto. By the Constitution of 1871 the German Empire vests its legislative power in the Federal Council and Imperial Diet. No mention is made of the Emperor, but in certain specified bills concerning the army, taxes, etc., the proposal of the Federal Council only is accepted and this gives to the Emperor as King of Prussia the right of veto against its action. The Swiss federal Constitution gives the President no veto power, but in certain cantons the right rests with the voters. In the Kingdom of Poland the objection of a single deputy was sufficient to nullify the bill.

"This history, and these illustrations, serve to show that the people of all constitutional governments are extremely solicitous and jealous of this power, and have at all times hedged it about by carefully expressed limitations. Consequently it follows that the right of its exercise by an executive must always be supported by plain and undoubted authority. It has of recent date been the gradual and growing belief that this power is widely placed in the executive head of municipal authority, not as essential to preserve an equilibrium of governmental power, but for almost the sole purpose of a check upon corrupt and hasty action and ill-considered legislation. This is not a new idea but it was not accepted until experience has shown it to be, usually, for the best interests of the people in the government of cities. Franklin long ago stated one reason for the lodgment of this power in an executive. 'A single man may be afraid or ashamed of doing injustice; a body is never either one or the other, if it is strong enough. It cannot apprehend assassination, and, by dividing the shame among them. it is so little a piece that no one minds it.' While, for these and other reasons it is doubtless the tendency of modern legislation to bestow this power upon the executive head of municipal government with much liberality, yet it is equally true, and always to be borne in mind, that the power must be express or necessarily implied. and without it. it does not exist. Dill. Mun, Corp. (4th Ed.) secs. 208-331; Martindale v. Palmer, 52 Ind. 413;

National Bank v. Town of Grenada, 41 Fed. Rep. 91: MacKenzie v. Wooley, 39 La. Ann. 949, 3 South. Rep. 128."

The rule is better stated in Field v. People, 3 Ill. 79.

It, therefore, follows that the yardstick that measures this veto power of the Governor must be the pertinent provisions of the Constitution, and that power lies in the language of the provisions and what is necessarily implied therefrom.

Those who are supporting the contrary view to this dissenting opinion mention many rules of interpretation which they invoke to assist them in arriving at their conclusion; but if our recollection serves us correctly, we do not think that the rule we have just discussed has been mentioned.

We now come to the point where we deem it necessary to lay down rules that we think are applicable in aiding us in a proper interpretation of the specific provisions as to the veto power of the Governor in our Constitution.

The advocates of the opposition to our contention herein lay great stress upon what they designate a broad interpretation and consideration of all of the constitutional provisions relative and pertinent as they deem them, and one of the criticisms that they make of the leading case, which they designate and we will designate as the "West Virginia" case, is that it fails to consider the question in the light of extended interpretation of other provisions of the Constitution. The writer contends that no such rule is applicable to the provisions of our Constitution under consideration. It is only when there is ambiguity and uncertainty in the language and phraseology of the provisions under consideration that extraneous aids of interpretation are resorted to. The following is paragraph 47 of 12 C. J. 703-705:

"While it is the duty of the courts to ascertain and carry into effect the intent and purpose of the framers of a Constitution, this intent must be that which they have embraced in the instrument itself. To ascertain the meaning of a Constitution, therefore, the first resort in all cases is to the natural signification of the words used, in the order and grammatical arrangement in which the framers have placed them. If, thus regarded, the words used convey a definite meaning which involves no absurdity and no contradiction between parts of the same writing, then the meaning apparent on the face of the instrument is the one which alone courts are at liberty to say was intended to be conveyed. And this meaning,

when so ascertained, must be taken as the authoritative rule. There is no occasion for construction in such cases, and it is not allowable. So, where the Constitution speaks in plain language with reference to a particular matter, courts must not place a different meaning on the words employed because the literal interpretation is inconsistent with other parts of the Constitution in relation to other subjects."

To the same effect are numerous authorities given in the notes.

As heretofore stated, the two provisions of our Constitution under consideration are sections 11 and 12 of article 6, and our contention is that the only reason that section 11 is involved at all is that it pertains to the same subject, namely, the questions of the veto power of the Governor. In drawing the analogies between the two sections, it must be kept in mind that the pertinent section is section 12 and that its provisions, plain and specific as we hold them to be, control and define the power of the Governor in the kind of a veto that should have been exercised in this case. It does not need the aid of extraneous interpretation, but its scope and purpose can be determined entirely from its own terms. Paragraph 52, 12 C. J. 707, reads as follows:

"Under the maxim, 'expressio unius est exclusio alterius,' the enumeration of certain specific things in a constitutional provision will usually be construed to exclude all things not thus enumerated; but this is a rule to be used merely in ascertaining the true meaning, and is not a rigid rule of universal application, and should never be applied to obscure the meaning or thwart the purpose of a constitutional provision."

The portion of paragraph 55, same page and authority, reads as follows:

"The presumption and legal intendment is that each and every clause in a written Constitution has been inserted for some useful purpose, and therefore the instrument must be construed as a whole in order to ascertain both its intent and general purpose and also the meaning of each part."

If there is any conflict between sections 11 and 12 of our Constitution under consideration, but which conflict we do not admit, then section 12, being a special provision and being an exception to the general provision, section 11 preceding it. must prevail over the general provision. In this connection see paragraph 57, 12 C. J. 709.

The people, through their Constitutional Convention, undoubtedly had a purpose in placing section 12 in our Constitution, and if its meaning, as expressed, can be deter-

mined, it must control. It is there, and cannot be swept away by the wave of the hand. Its meaning cannot and should not be frittered away by the skillful arts of interpretation. We hold that section 12 conflicts with no provision of the Constitution. It is perfect and complete within itself. Paragraph 56, 12 C. J. 709, reads as follows:

"Distinct constitutional provisions are repugnant to each other only when they relate to the same subject, are adopted for the same purpose, and cannot be enforced without substantial conflict."

To the same effect is paragraph 62, page 710, same authority, discussing when extrinsic aids of construction should be invoked.

Whatever the people have expressed in their Constitution by the plain language of the people should and of right ought to control, and will control unless the plain meaning is juggled out by arts of extraneous construction. The 10th paragraph in the case of Field v. People, 3 Ill. 533, reads as follows:

"Where a constitutional provision is plain and clear, construction is a dangerous argument."

To the same effect we quote the following from Monongahela Nav. Co. v. Coons, 6 Watts & S. Rep. (Pa.) 114:

"It was aptly said by Chief Justice Tilghman, in the Farmers' and Mechanics' Bank v. Smith (3 Serg. & Rawle, 69) that conventions to regulate the conduct of nations are not to be interpreted like articles of agreement at the common law; and that where multitudes are to be affected by the construction of an instrument, great regard should be paid to the spirit and intention. And the reason for it is an obvious one. A constitution is made, not particularly for the inspection of lawyers, but for the inspection of the million, that they may read and discern in it their rights and their duties; and it is consequently expressed in the terms that are most familiar to them. Words, therefore, which do not of themselves denote that they are used in a technical sense, are to have their plain, popular, obvious, and natural meaning; and, applying this rule to the context of the Constitution, we have no difficulty in saying that the state is not bound beyond her will to pay for property which she has not taken to herself for the public use."

If, in section 12, the people have declared through their Constitution and defined therein completely, and when interpreted in accordance with the canons of interpretation that we have heretofore cited, and may hereafter cite, as to just how and when and

in what manner the Governor may vote a general appropriation bill or any of its distinct items, it will not be denied that the people had that power; neither can it be denied that the provisions of said section 12, if it plainly expresses the will of the people, must control. We may in the course of our discussion refer to other provisions of the Constitution, and especially so to section 11, because it deals with the same question, the power of veto, but our reference to other provisions of the Constitution will not be for the purpose of aiding in interpretation so much as it will be to show that there is no necessity for interpretation.

The opponents of our position in this dissenting opinion have totally ignored in their brief and discussion of this matter the rules of interpretation that we have laid down and which we hold to be controlling herein. They move immediately to the attack upon section 12 with heavy and light artillery, cannister, grape, and machine gun to destroy this innocent and unoffending section, instead of seeking to give it a fitting place, with a purpose, in our Constitution. They seek to fritter away its purpose and make it meaningless, that a special and favored construction may be promoted. This method is dangerous and revolutionary. See, in this connection, Chance v. Marion County, 64 Ill. 68, 69. Also, Meyer, State Auditor, v. Clift, 31 Okla., reading on pages 799 and 800 (123 Pac. 1042).

To repeat, section 12, if by its plain and clear terms its purpose is clear, and it is not in manifest conflict with section 11, it must be given full force and effect. The two provisions of our Constitution are as follows:

"Section 11. Every bill which shall have passed the Senate and House of Representatives, and every resolution requiring the assent of both branches of the Legislature, shall, before it becomes a law, be presented to the Governor; if he approve, he shall sign it; if not, he shall return it with his objections to the house in which it shall have originated, who [which] shall enter the objections at large in the Journal and proceed to reconsider it. If, after such reconsideration, two-thirds of the members elected to that house shall agree to pass the bill or joint resolution, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by two-thirds of the members elected to that house, it shall become a law, notwithstanding the objections of the Governor. In all such cases, the vote shall be determined by yeas and nays, and the names of the members voting

shall be entered on the Journal of each house respectively. If any bill or resolution shall not be returned by the Governor within five days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the Legislature shall, by their adjournment, prevent its return, in which case it shall not become a law without the approval of the Governor. No bill shall become a law after the final adjournment of the Legislature, unless approved by the Governor within 15 days after such adjournment.

"Section 12. Every bill passed by the Legislature, making appropriations of money embracing distinct items, shall, before it becomes a law, be presented to the Governor; if he disapproves the bill, or any item, or appropriation therein contained, he shall communicate such disapproval, with his reasons therefor, to the house in which the bill shall have originated, but all items not disapproved shall have the force and effect of law according to the original provisions of the bill. Any item or items so disapproved shall be void, unless repassed by a two-thirds vote, according to the rules and limitations prescribed in the preceding section in reference to other bills. Provided, that this section shall not relieve emergency bills of the requirement of the three-fourths vote."

It is our contention that section 11 only pertains to bills, resolutions, etc., passed by the Legislature other than appropriation bills embracing distinct items of appropriation, while section 12 only applies to appropriation bills having distinct items.

Section 56, article 5, of the Constitution reads as follows:

"The general appropriation bill shall embrace nothing but appropriations for the expenses of the executive, legislative, and judicial departments of the state and for interest on the public debt. The salary of no officer or employe of the state, or any subdivision thereof, shall be increased in such bill, nor shall any appropriation be made therein for any such officer or employe, unless his employment and the amount of his salary shall have been already provided by law. All other appropriations shall be made by separate bills, each embracing but one subject. (Bunn's Ed., sec. 129.)"

Section 57, article 5, reads as follows:

"Every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title, except general appropriation bills, general revenue bills, and bills adopting a code, digest, or revision of statutes; and no law shall be reviewed, amended, or the provisions thereof extended or conferred, by reference to its title only; but so much thereof as is revived, amended,

extended, or conferred shall be re-enacted and published at length; Provided, that if any subject be embraced in any act contrary to the provisions of this section, such act shall be void only as to so much of the law as may not be expressed in the title thereof. (Bunn's Ed., sec. 130.)"

We have referred to these two provisions for the purpose of showing the fact that general appropriation bills are an exception and make provision for them having separate and distinct items of subjects to deal with. The first section shows what they shall include, and the next section shows that they may embrace more than one subject. We will now take up a comparison and analysis of sections 11 and 12 of article 6 of our Constitution, pertaining to the veto power of the Governor, and show that each deals with distinct matters and they do not and cannot answer the same purpose, and thereby showing the reason for the existence of each and their meaning and that each has a distinct purpose and stands alone.

The forepart of section 11 reads as follows:

"Every bill which shall have passed the Senate and House of Representatives, and every resolution requiring the assent of both branches of the Legislature, shall, before it becomes a law, be presented to the Governor. * * *"

The forepart of section 12 reads as follows:

"Every bill passed by the Legislature, making appropriation of money embracing distince items, shall, before it becomes a law, be presented to the Governor. * * *"

The above quoted portion of section 11 is general, and, standing alone, could include and would include every bill making appropriation of money embracing distinct items; and but for the fact that the quoted portion of section 12 particularizes and defines at its very inception as to what kind of bills it deals with, we would say that the quoted portion of section 11 is sufficient to cover all bills; but by applying one of the rules of interpretation we have already laid down, which says that particular provision must prevail over a general provision, we cannot say that, since the people through their Constitution makers have set aside a distinct section covering a special kind of bill, they would not have a particular purpose therein and that said section 12 is, therefore, meaningless and has no purpose. Neither is there any conflict except conflict of purpose, or, better to say, different purposes. The provisions of section

11 apply to all kinds of legislation except appropriations with distinct items, while section 12 applies to appropriations with distinct items. Both kinds of bills shall, before they become a law, be presented to the Governor before adjournment. No conflict there. All in pursuance of the distinct purpose of each section.

The next provision of section 11 reads as follows:

"If he approve, he shall sign it; if not, he shall return it with his objections to the house in which it shall have originated, who [which] shall enter the objections at large in the Journal and proceed to reconsider it."

The next provision of section 12 reads as follows:

"If he disapprove the bill, or any item, or appropriation therein contained, he shall communicate such disapproval, with his reasons therefor, to the house in which the bill shall have originated."

And now is when we see the diverging purpose and method of the two sections begin to appear. The bills that are intended to be covered by section 11 are bills which the Governor must either approve and sign in toto or reject in toto. His veto goes to the entire bill, and he cannot reject part and approve part. He cannot approve part; but if he approves any, he must approve it all; and we will here state that the case of Regents of State University v. Trapp, 28 Okla. 83 (113 Pac. 910), decides the very distinction that we are making between these two provisions of these two sections.

The bill under consideration in the cited case, this court held to come within section 11, and not section 12, since held to be a special appropriation bill containing only one item of appropriation and that the Governor could not approve part and disapprove part, and held that said bill was controlled by the provisions of section 11. We take the following from the body of the cited opinion, found on page 91:

"The meaning of the foregoing section is not obscure and the object it was intended to accomplish is apparent. Without that provision, all bills of whatever character could be approved or disapproved by the Governor only in their entirety. But by section 57, art. 5, general appropriation bills may embrace more than one subject; and if the veto power were confined to the whole bill, the Governor might often be required to destroy much good legislation in order to defeat one item of a bill that was bad, or, on the other hand, be compelled to approve a piece of legislation vicious in part,

in order to obtain the benefits of the salutary provisions of the same act. It was to enable the Governor to approach in a measure the consideration and approval of a bill carrying items of appropriation with the same power that the members of the legislative departments are authorized to act upon it, in that he may consider and approve some of the items separately without being required to approve them all. But this power is conferred upon him only as to bills that make appropriations of money 'embracing distinct items,' and it was contemplated that it should apply only to those bills where more than one item of appropriation was made. Whether the power to approve some of the distinct items of an appropriation bill and to disapprove others carries with it the power to reduce any item to the sum less than provided in the act and then approve it, as seems to have been the opinion of the Governor, is not here necessary to determine; for, upon the more serious reason that the act under consideration does not fall within the class of acts embraced in section 12, article 6, the Governor was without power to approve the bill in part and disapprove it in part."

It is very apparent from the quoted portion of the cited case that the court recognizes the distinction between section 11 and section 12, and that section 11 applies to all bills and enactments and resolutions passed by the Legislature except appropriation bills with distinct items, and that the vetoing of the last named class of bills this opinion recognizes to be covered by section 12, article 6. The cited case nowhere discusses the powers of the Governor under either provision after the adjournment of the Legislature, that not being involved in the cited case.

The attorneys representing the plaintiff in error in their brief, as heretofore stated, have sought to destroy the force and effect of section 12, and according to their analysis there is no reason for the existence of section 12 at all. It is meaningless, and according to their contention all that would be necessary would be to have inserted a few words in section 11 making the provisions as to veto in section 11 applicable to the distinct items of an appropriation bill.

In most of the state Constitutions the provisions as to the veto are embodied in one single section and embrace provisions making the general method of veto applicable to distinct items in appropriation bills. In this connection we recall the Constitutions of two states that do this and which we have examined, namely, those of the states of Washington and California, and the provisions of their Constitutions are plain and

the purpose is unmistakable. That of the state of California is particularly so. But that is not the situation as to our Constitution, and the plain provisions of our Constitution, as set forth in section 12 being plain, their express terms cannot be shunted aside and their purpose frittered away by applying to them false canons of construction.

To resume our comparison, the second quoted provision of section 12 provides that the Governor may disapprove the bill or any item of appropriation therein contained. This was something that he could not do under the last quoted provision of section 11, which requires him to approve all or disapprove all, while under the last quoted provision of section 12 he may disapprove part or he may disapprove all. "He shall communicate such disapproval", reciting from the second quotation from section 12, "with his reasons therefor, to the house in which the bill shall have originated"; while the language in the second quotation or quoted provision of section 11 says "he shall return it with his objections, to the house in which it shall have originated, who [which] shall enter the objections at large on the Journal and proceed to reconsider it."

The language in the two sections is entirely different. It uses the expression in section 11 "return" instead of "communicate," as used in section 12, and in section 11 "objections" is used instead of "disapproval." In section 12 it says "with his reasons therefor" added to his disapproval. The act of the Governor seems to convey an idea of more particularity and elaborateness in the method of disapproval in the provisions of section 12 than is provided in the quoted provisions of section 11.

In the second quoted provision of section 11, the house to which the bill is returned "shall enter the objections at large in the Journal and proceed to reconsider it." This requirement is not named in the second quoted provision of section 12.

The third provision of section 11 reads as follows:

"If, after such reconsideration, two-thirds of the members elected to that house shall agree to pass the bill or joint resolution, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by the two-thirds of the members elected to that house, it shall become a law, notwithstanding the objections of the Governor."

This last quoted provision of section 11 is the only provision to which reference is made in section 12. This reference is made

in the last provision of section 12, wherein the last provision of section 12 states that the provisions disapproved are to be repassed by two-thirds vote according to the rule and limitations prescribed in the preceding section in reference to other bills. This only provides as to the method of repassing the bill.

The expression "other bills," used in the last section of section 12, points another reason and shows that the bill that section 12 deals with has reference to a particular kind of a bill, namely, appropriation bills with distinct items, while the preceding section deals with the other bills.

The third provision of section 12 that we will quote and discuss reads as follows:

"But all items not disapproved shall have the force and effect of law according to the original provisions of the bill."

Preliminary to the discussion of this provision, we will state that the interpretation of these veto provisions has heretofore been, and which interpretation the supporters of the position against this dissenting opinion contend is right, that the Governor has the right after the adjournment of the Legislature and having in his possession an' appropriation bill with district items, to disapprove an item or items or all of an appropriation bill, or that he has the right to approve part and disapprove part, or approve all; meaning he has this right after the adjournment of the Legislature.

We will state this: That there is no provision in section 11 for the Governor to exercise an affirmative veto after adjournment of the Legislature under section 11. The Constitution itself has done the vetoing, and the Governor has it in his power, if he acts within 15 days after adjournment, to nullify the constitutional veto as provided in section 11, by approving a law and putting life into it. Therefore, the only authority whereby the Governor can veto a bill in the manner he has undertaken to veto the bill in the instant case, he must get, if he gets it anywhere, from the provisions of section 12.

The Governor undertook to put life into the appropriation bill by approving all provisions that he had not disapproved. This he could find authority to do under the last provision of section 11 if those provisions applied to the kind of a bill as in the instant case. But his authority to disapprove and veto affirmatively a portion of an appropriation bill, after adjournment, with distinct items, is not given him by section 11; that must be found in section 12, if found anywhere.

We shall now resume a discussion of the third provision of section 12, just quoted, and take up the task of showing when an appropriation bill containing distinct items becomes a law relative to the adjournment of the Legislature and when the Governor can exercise an affirmative veto upon any item of such a bill, and our conclusion is that the plain provisions of section 12 control, and do so in one of the two ways as follows (we refer to when the items of an appropriation bill become effective):

The first method may be as follows: When an appropriation bill containing distinct items is presented to the Governor and he exercises his right to an affirmative veto on any item or items of such bill, and to be effective this must be done before the adjournment of the Legislature and done in accordance with the provisions of section 12, this has the effect of vetoing those items and forcing their reconsideration; and contemporaneous with that act of the Governor in thus vetoing certain items, the other items of said bill by such act of the Governor immediately become legal. It takes a concurrence of his mind and his act to complete it, and when he decides and acts, and reports it to the house, then is when the items vetoed must be reconsidered and repassed, and the items not so vetoed become eo instanti lawful.

The third provision of section 12, that we have heretofore quoted, provides that all items not disapproved shall have the force and effect of law according to the original provisions of the bill. This unmistakably contemplates that no affirmative act on the part of the Governor is necessary to make the items not disapproved effective and lawful, and, to repeat, they become law the very moment that the Governor exercises his right of affirmative veto upon any item of such bill and so exercised before the adjournment of the Legislature.

The second method may be in this wise: If the Governor fails to act before adjournment, and an adjournment takes place with an appropriation bill in the hands of the Governor, the effect is that eo instanti with adjournment the bill becomes effective.

We think that our position and reasoning in this is perfectly clear and cannot be successfully answered. It is argued, however, that section 12 fails to specifically provide in plain and unmistakable language that the things that the Governor can do as provided by the terms of section 12 can only be exercised before the adjournment of the house; that, hence, by implication he has

the power to do those things after the adjournment of the house.

The proponents of the increased power of the Governor's veto, after exhausting the arts or construction in their efforts to obliterate section 12, and when they attempt the practical application of their veto, they drift into a palpable inconsistency, and not finding any provision in section 11 giving the Governor power to exercise an affirmative veto after the adjournment of the Legislature, they are compelled to turn to the provisions of section 12 to find justification for exercising an affirmative veto on the items of an appropriation bill with distinct items to be so exercised after the adjournment of the Legislature.

The second quoted provision of section 11, reading as follows:

"If he approve it, he shall sign it; if not, he shall return it with his objections to the house in which it shall have originated, who [which] shall enter the objections at large in the Journal and proceed to reconsider it"

—is no more specific than is the corresponding provision, showing the manner of vetoing an appropriation bill of distinct items, provided in section 12. No one contends that what is provided in said provisions for the Governor to do, to veto a bill under said section 11, be done at any time than before the Legislature adjourns. Supposing, therefore, section 11 did not contain its last provision as to the adjournment during the five days (Sundays accepted), that the bill is in the hands of the Governor, and did not provide a constitutional veto, and provides as it does for the defeat of constitutional veto by an affirmative approval of the Governor; does any one contend that the power of veto by the Governor, or a constitutional veto, would arise by implication out of the first division of section 11? To so hold would be to run counter, not only to the canons of construction, but in opposition to the settled theory of the source and grant of executive power under our constitutional and representative government. A fortiori, we ask, how can any power be raised by implication from section 12 giving the Governor the power of veto after adjournment? To repeat, it can nowhere be found in the specific provisions of section 11, as to the fate of bills after adjournment, for an affirmative veto by the Governor, and neither can the power of affirmative veto by the Governor after adjournment be found in section 12, either specifically or by implication. The necessary implications of section 12 deny the power of

the Governor to approve any distinct items of an appropriation bill, since it says all items not disapproved shall become effective and lawful if not disapproved, and the provisions of section 11 as to approval by the Governor after adjournment being held not applicable to appropriation bills with distinct items, we may well ask, where does the Governor get his authority to either approve or disapprove any item of an appropriation bill after the adjournment of the Legislature?

Our contention is that the plain and unmistakable language of section 12 shows that the Governor can only exercise the power as given him under section 12 before the adjournment of the Legislature, and not thereafter.

A portion of the language of the last cited portion of section 12 reads as follows:

"Any item or items so disapproved shall be void."

Our contention is that this provision refers to the second quoted provision of section 12, which provides the method of disapproval that the Governor must exercise to make an item void; which provision defining the method of disapproval we are going to requote at this point:

"If he disapproves the bill, or any item, or appropriation therein contained, he shall communicate such disapproval, with his reasons therefor, to the house in which the bill shall have originated."

It is this provision and the method of disapproval therein defined that is referred to in the following language:

"Any item or items so disapproved shall be void unless repassed by two-thirds vote," etc.

This last quoted provision has inserted in it the tell-tale word of two letters, "so". The phrase "so disapproved" by any rule of reasonable interpretation must be held to refer to the method of disapproval as defined by the first above quoted provision. It "so disapproved" means that the Governor, to make his disapproval complete and have the effect of making the items void, shall submit his disapproval, with his reasons therefor, to the house in which the bill originated, then this must inevitably contemplate that all this must be done before the Legislature adjourns. There is no provision in our Constitution, as is provided in some Constitutions, for referring bills back to the Legislature when it reconvenes.

In the English case of Giles v. Melson. 28 Law Times (N. S.) 790, we find an in-

teresting discussion of the expression, "so specifically devised," and the reasoning of Lord Selborn is so good that we will quote a portion of his opinion where he discusses this phrase and which we think has great application to this case:

"My Lords, I cannot but think that it is of very great importance to adhere to the rule that words are to have their natural signification, and that legal and technical words are to have their legal and technical signification, unless there be something in the context of a particular instrument to show the contrary. It is not very clear, but dealing with these words as they stand, they seem to me to speak for themselves, and to involve no difficulty of construction. I am led to follow the argument as to the general scheme of the will. It is, I venture to say, a perilous and hazardous argument in most cases where it is used. I do not say that there are not cases in which it may be properly used, but certainly it is an argument which seeks to escape from the necessity of grappling with the meaning of particular words upon grammatical principles, and endeavors to get into a region of speculation as to the probable intent of the testator. There are cases in which the ambiguity of particular expressions is such that there may be no better mode than that for their construction. But these are not cases one would desire to follow, except where there really is an ambiguity of that kind. However, if I were to attempt to follow the learned counsel in that line of argument, I should say that the general scheme of this will would not lead me to the conclusion that it was intended, as against the widow in this particular case, to separate from the property originally given that which the testator had added to it by words, saying that it was to be held in the same manner as the estates previously devised. So far as there is a scheme here, it does not show any disposition to deal with that which is added differently from that which was originally given, as against the devise for the children of the sons. If the words by which the addition is made may admit of some doubt as to whether they would go beyond the sons themselves (I do not say they do, but it is not a point which it seems to me necessary for us now to decide); certainly, the probable intention is that they were meant to provide for the children as well as for the parents. And if they were meant to provide for the children as well as for the parents. I can find nothing in this will leading to the conclusion that there was any intention to draw a line adversely to the widows in that case. Therefore, looking through the will, I can see no context which at all requires or justifies a departure from the proper sense, as I understand it, of the words 'so specifically devised,' which, coming when they do, include everything which had been previously given. Two arguments were relied upon by the respondents. First

of all it was said that this clause, being in the shape of a proviso, ought really to be split up into three clauses, and read in that form into earlier parts of the will, with the effect of making the words, 'so specifically devised,' receive from the context a more limited application than that which they would receive in the place where they occur. That is a similar mode, certainly, of dealing with the construction, to transpose, without necessity, words from the place where they occur, in order to make a word of reference that is found with them, namely, the word 'so' in 'so specifically devised', apply to a different subject from that to which it would naturally apply where it is found. Of course, if you put into the clause immediately after the first gift of the estate to John, the words, 'so specifically devised,' in that place, they would only apply to those estates. But you do not find them there."

The author of Pope's Legal Maxims, vol. 2, page 1490, construed the words "so devised" to mean hereinabove devised. The same author on the same page gives this definition to the word "so": "So—when used in connection with something to be done— e. g., 'so complete'—embraces the doing of the thing in the manner and so as to satisfy the requirements previously prescribed."

The use of the word "so" in a phrase in contracts and laws, both statutes and Constitutions, has been passed upon in a number of cases. We will cite and quote from a few of them.

The word "so" means "hence" and "therefore", when it is used to connect that which is an illustration of or conclusion from that which is stated before. Clem v. State, 33 Ind. 418, 431.

"'So,' as defined by Webster, means 'in the same manner, as has been stated, in this or that condition or state, under these circumstances; in this way, with reflex reference to something which is asserted,' and is so to be construed when used in an indictment. Blanton v. State, 24 Pac. 439, 441, 1 Wash. St. 265."

"As used in an act declaring that, in case a writ shall be lost or embezzled, the record thereof cannot be given in evidence, the statute authorizing it only in cases where the direction of the act is followed, the language of which is, 'and the record of such writ, so made, shall be as good evidence as the writ itself,' the words 'so made' refer to the antecedent directions for recording the execution before it is delivered to the sheriff, and should be read thus, 'the record of a writ recorded before it is delivered to the sheriff shall be as good evidence as the writ itself', and hence subsequent recording of the execution is of no avail. El-

mer v. Burgin, 2 N. J. Law (1 Penning.) 186, 193."

See, also, Terrel v. Sayre, 3 N. J. Law (2 Penning.) 183, 188; Tomkinson v. Straight, 17 C. B. 697, 705; Broughton v. Sherman, 21 Minn. 431, 433; The Santee (U. S.) 21 Fed. Cas. 411, 413; Appeal of Yearnshaw, 25 Wis. 21, 25; Commonwealth v. Smith, 44 N. E. 503, 504, 166 Mass. 370: Newall v. Brill (Cal.) 83 Pac. 76.

The supporters of the increased power of the Governor's veto ask, What are you going to do with the five days provision embraced in section 11 reading as follows?

"If any bill or resolution shall not be returned by the Governor within five days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the Legislature shall, by their adjournment prevent its return, in which case it shall not become a law without the approval of the Governor. No bill shall become a law after the final adjournment of the Legislature unless approved by the Governor within fifteen days after such adjournment."

Our answer is leave it where we find it, in section 11, where it fits in very nicely to carry out the sense of said section as derived, first, from its plain language, and, secondly, from its plain purpose. It uses the words "bill" and "resolution" the same as are used in the first part of section 11, which we hold refers to all bills and resolutions that may be passed by the Legislature except appropriation bills with distinct items.

Another part of the language says, in substance: In the event the Governor has it in his possession five days (Sundays excepted) before adjournment without acting it shall become a law the same as if he had signed it; and since it is only in section 11 that it is provided that the Governor, if he approve a bill or resolution, must sign it, and it is nowhere provided in section 12 that it is necessary for the Governor to approve and sign, but it does by its specific terms provide for him to disapprove, and does by its specific terms provide that if he does not disapprove, such items shall become law according to the other original provisions of the bill—must mean that the provisions of section 11 that we have quoted above are only intended to apply to all bills and resolutions passed by the Legislature, but not including appropriation bills with distinct items, the veto of which can only be as is provided by section 12.

We think this theory is carried out and is unmistakably shown by comparing the evident purpose of the two sections as we have herein defined them to be. This comparison we will now give.

Under section 11, if the Legislature wants to avoid a constitutional veto, of any bill or resolution, caused by adjournment, it must pass such bill or resolution and get it in the hands of the Governor five days (Sundays excepted) before it adjourns; while under section 12, and as we have interpreted it herein, the Legislature is protected from such a result in its appropriation bills where the Legislature takes an adjournment immediately after passing an appropriation bill, since the Governor must disapprove any item or items or the entire bill and communicate such disapproval with his reasons therefor to the house in which it originated and thereby force its reconsideration and repassage by a two-thirds vote of all the elected members, and, of course, contemplates this must happen before adjournment, to be effective, otherwise, the whole bill becomes a law.

We think the only thing the Governor has to do, as to time, to force reconsideration of an appropriation bill, is to get his disapproval in the manner provided in section 12 to the house wherein it originated before it adjourns; then it is up to the Legislature to repass it according to the rules and limitations provided in section 11 in reference to other bills. We do not think the five days provision applies to section 12 at all.

The only reference section 12 makes to section 11 is the following portion of its last provision:

"Any item or items so disapproved shall be void unless repassed by a two-thirds vote according to the rules and limitations prescribed in the preceding section in reference to other bills."

By this provision it is only intended to adopt the procedure and the manner of taking the vote and recording same as is provided in section 11, and according to the rules of interpretation we give herein, wherein section 12 has thus specifically stated what portions of section 11 it adopts, then it must follow that that was all that it intended to adopt, and none are adopted by implication unless this is made necessary by the impossibility of giving section 12 a complete and consistent purpose by its own inherent meaning derived from its own terms. We have been able to give it that consistent purpose from its own inherent meaning derived from its own terms, and, according to all the authorities, this must prevail as against all attempts to construe it to be otherwise.

The majority opinion does not, in fact, seem to discuss directly the question of veto, but seems to hold the particular item in controversy to be illegally passed, or at least illegal, without clearly stating the reasons for such holding.

It is admitted in the majority opinion that under the provisions of the Constitution the Governor has no power given him to affirmatively veto or nullify a legislative enactment after the adjournment of the Legislature. A portion of section 12, and which portion we have herein discussed, reads as follows:

"but all items not disapproved shall have the force and effect of law according to the original provisions of the bill."

This, of course, means disapproval by the Governor, and means that in the absence of such disapproval they shall become law.

If the Governor has not the power to disapprove any distinct item of an appropriation bill, or the bill itself, after the adjournment of the Legislature, as is contended by the majority opinion, and with which contention we agree, and he having failed to disapprove the appropriation bill or any item therein before adjournment, then it must inevitably follow that the entire bill becomes a law immediately upon the adjournment of the Legislature. As a result of this conclusion, those seeking to uphold the veto and invalidity of the items sought to be vetoed are left to resort to the last provision of section 11. We have shown herein, however, that this provision cannot be made applicable to the appropriation bill with distinct items, and that its provisions are absolutely irreconcilable with the provisions of section 12, which provisions of section 12 definitely state how an appropriation bill containing distinct items may become a law or how it shall be disapproved and as a result thereof may fail to become law. From these conclusions that we have drawn herein, we do not think there is any escape.

The method of the veto of an item of a general appropriation bill as provided in section 12 is mandatory by its express terms. It uses the word "shall" and indicates by every expression an intention to make the provision mandatory, and to veto any item in a general appropriation bill this provision must be complied with. A discussion of mandatory and directory provisions in the Constitution is found in' paragraphs 145, 146, 147, 12 C. J. 740:

"It is an established rule that constitutional provisions are to be construed as mandatory unless, by express provision or by necessary implication, a different intention is made manifest. Some cases even go so far as to hold that all constitutional provisions are mandatory. But more accurately, the test as to whether a provision is mandatory or directory is the intention of those who framed and adopted it. This intention is to be gathered, not so much from a technical construction of particular words, as from a consideration of the language and purpose of the entire clause. There is a strong presumption in favor of its being mandatory. But if it appears from the express terms of a provision, or by necessary implication from the language used, that it was intended to be directory only, it will be so construed.

"As a general rule, all provisions that designate in express terms the time or manner of doing particular acts and that are silent as to performance in any other manner are mandatory and must be followed."

. Applying the above rules of interpretation to this vetoing provision of section 12, there is no escaping the conclusion that said provision is intended to be mandatory, and must be followed.

There is but one other state in the Union that possesses similar provisions as to the vetoing power of the Governor as to appropriation bills to those contained in our Constitution, and that is the Constitution of West Virginia. Section 12 of our Constitution that we have been discussing, and which defines the method of vetoing provisions of appropriation bills containing distinct items, contains the same provisions as does the section 15, article 7, of the Constitution of West Virginia. Said article 7 embraces the provisions as to the executive department of that state. There is one difference between section 15 of the West Virginia Constitution and section 12 of our Constitution, and that is, in the West Virginia provision a majority is sufficient to repass a vetoed item over the Governor's veto; while in the Oklahoma provision it takes a two-third vote of the elected members to repass it over the Governor's veto.

The West Virginia Constitution was adopted in 1872. Our provision of the Constitution was adopted from the West Virginia Constitution. The highest appellate court of West Virginia had not, however, interpreted said section 15 prior to the adoption of our Constitution, but has since said time interpreted said provision in a case directly involving the same question that is involved in the instant case, namely: The power of the Governor to veto a distinct item in an appropriation bill after the

adjournment of the Legislature. The West Virginia Supreme Court placed the same interpretation upon their section of the Constitution, that is section 15, that we, in this dissenting opinion, have placed upon section 12 of our Constitution. The case from West Virginia Supreme Court so deciding this question is May v. Topping, 65 W. Va. 656, 64 S. E. 848.

The question came before the Supreme Court of West Virginia a second time in the case of Woodall v. Darst, 77 S. E. 265, and the holding in the former case was affirmed in the second case. We insert herein the following portion of the case of May v. Topping, cited above:

"That question is: Can the Governor veto an item in the general appropriation bill after the adjournment of the Legislature?

"The question is, we are of opinion, answered by the plain terms of the Constitution wherein it prescribes that which governs in such cases. Article 7, section 15 (Code 1906, p. LXVII). This organic constitutional provision, in view of its character and purpose, is necessarily mandatory. It provides 'every bill passed by the Legislature making appropriations of money, embracing distinct items, shall, before it becomes a law, be presented to the Governor; if he disapproves the bill, or any item or appropriation therein contained, he shall communicate such disapproval, with his reasons therefor, to the house in which the bill originated; but all items not disapproved shall have the force and effect of law according to the original provisions of the bill. Any item or items so disapproved shall be void, unless repassed by a majority of each house according to the rules and limitations prescribed in the preceding section in reference to the other bills.' How is it ordained by this supreme and mandatory law that an item in an appropriation bill embracing distinct items shall be disapproved by the Governor? Plainly is it stated therein that, if he disapproves such item, he shall communicate such disapproval, with his reasons therefor, to the house in which the bill originated. It is this action of the Governor in communicating such disapproval, with his reasons therefor, to the house in which the bill originated that consummates and effects a veto of the item. The communication of his disapproval, with his reasons therefor, is the disapproval itself. The obligation upon the Governor to communicate his disapproval of an item, with his reasons therefor, to the house in which the bill originated is a mandatory one to bring about the qualified veto that is given him in such instances. Unless he communicate as directed by this constitutional provision, he approves, and does not disapprove. The last clause of the section clearly discloses such interpretation. It says: 'Any item or items so disapproved shall be void, unless repassed by a majority of each house.' The use of these words makes one to inquire: How disapproved? Clearly they relate not simply to disapproval in the mind of the Governor, but to some act of disapproval, some manner of disapproval. That act or manner of disapproval provided for just above these words, and to which 'so disapproved' clearly relates, is by communication with reasons to the house in which the bill originated. 'Any item or items so disapproved shall be void, unless repassed.' The very connection between the words 'so disapproved,' and 'unless repassed' show that the Constitution intended that the disapproval of the Governor, to be a disapproval at all, must be communicated to the house of the Legislature in which the bill originated, so that the Legislature may again act upon the item; so that it may repass it, if the Governor's reasons for disapproval do not persuade it to do otherwise, by a majority of each house according to the rules and limitations prescribed. Only by being 'so disapproved' is the item declared void by the Constitution. Disapproval in any other form or manner does not affect it.

"The plain terms of the constitutional provision should prevail. A Constitution is made for the people and by the people. The interpertation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it; 'for as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument, in the belief that that was the sense designed to be conveyed.' Cooley's Const. Lim. 81. The great Chief Justice Marshall in the interpretation of a provision of the national Constitution said: 'As men whose intentions require no concealment generally employ the words which most distinctly and aptly express the ideas they intend to convey, the enlightened patriots who adopted it must be understood to have employed words in their natural sense, and to have intended what they said.' Gibbons v. Ogden, 9 Wheat. 188, 6 L. Ed. 23. There is no ambiguity in section 15 of article 7 (Code 1906, p. LXVII). It is plain. It needs no construction. The terms used in common everyday interpretation can mean nothing but that the Governor disapproves a distinct item in an appropriation bill by communicating his dissent, and his reasons therefor, to the house

that originated the bill, so that house may set in motion, if it desires, after hearing the Governor's reasons against the item, legislative action to repass the item by a majority of each house. The section plainly contemplates further legislative action, if the Legislature sees fit. Can there be such action after the Legislature has adjourned? The very fact that there cannot be determines that the Governor must express his disapproval before the adjournment."

The West Virginia Constitution contains two provisions defining the veto power of the Governor the same as does our Constitution. The West Virginia Constitution has a preceding section to the section just discussed and interpreted in the case of May v. Topping, being section 14 of article 7, and corresponding to our section 11 that we have heretofore discussed. The provisions of section 14 of the West Virginia Constitution and the provisions of section 11 of our Constitution are dissimilar in this respect. The provision of the West Virginia Constitution provides that if a bill is passed by the Legislature and placed in the hands of the Governor and the bill is not returned by the Governor within five days (Sundays excepted) after it shall have been presented to him, it shall be a law, in like manner as if he had signed it, unless the Legislature shall, by their adjournment, prevent its return, in which case it shall be filed with his objections in the office of the Secretary of State within five days after such adjournment, or become a law.

This provision gives the Governor of West Virginia the power of an affirmative veto after adjournment of the Legislature if exercised within five days after the adjournment under section 14 of the West Virginia Constitution; while, under section 11 of our Constitution, the adjournment of the Legislature during the five days operated to nullify any bill after adjournment. In other words, the Constitution does the vetoing. The Governor is given no affirmative veto after adjournment under our Constitution. The Governor may, however, under our section, approve the bill within 15 days after adjournment and make it a law.

This difference between section 14 of the West Virginia Constitution and section 11 of our Constitution has been cited as a reason why the West Virginia opinion should not be persuasive on this court, and that an interpretation of section 14 in connection with section 15 of the West Virginia Constitution tends more strongly to support the holding of the West Virginia case in its interpretation of section 15 of the West Virginia Constitution than the interpretation of section 11 with section 12 of our Constitution tends to support this dissenting interpretation of section 12.

We do not think that this position is tenable. If there is anything in the contention at all, we think that by analogous interpretation of the two sections in each of the Constitutions the weight of the interpretation is with our position construing our Constitution. This is true for the reason that the West Virginia Constitution, in section 14, gives the Governor an affirmative veto after adjournment of the Legislature; while there is no such power given the Governor under our Constitution in section 11.

They also contend that, since in section 15 of the West Virginia Constitution a majority vote is sufficient to repass a vetoed measure over the Governor's veto, while in section 12 of our Constitution it takes two-thirds vote of the elected members, this point is an argument supporting the West Virginia case and against our interpretation and our position in interpreting section 12 of our Constitution. We see no force in this argument, for the reason that in either event the Governor before the adjournment of the Legislature has the power to force reconsideration and a revote on the measure with the weight of his recommendations and reasons added against its repassage, and the only difference that there can be is in the degree of the power of his veto, and this difference consists in the smaller vote required in West Virginia than is required under our Constitution, and this argument and the one preceding it have no weight where we hold, as we have in this case, that the provisions of section 12 are clear and plain and complete within themselves and standing alone need no extrinsic aid to arrive at their meaning.

The question of contemporaneous construction has been raised in the instant case. It is true it appears that the executive officers of this state from the Governor down have heretofore interpreted the veto powers of the Governor to be of the kind that has been undertaken to be exercised in the instant case. The rule is that contemporaneous construction can be invoked to aid in the interpretation of statutory or constitutional provisions only when the meaning of the provisions is doubtful and they possess inherent ambiguity, but is never resorted to by the courts and is disregarded by the courts when the provisions

it is asked to construe are plain and clear. and need no construction.

The same question of contemporaneous construction was raised in the West Virginia case that we have heretofore cited and quoted. The Governor. and executive officers had placed a different interpretation upon the veto provisions of the West Virginia Constitution from that placed upon it in the case of May v. Topping, heretofore cited. · Upon the question of contemporaneous interpretation, the West Virginia case has this to say:

"The rule of contemporaneous or practical construction is sought to be invoked. We are cited to Lewis' Sutherland on Statutory Construction, section 472 et seq. This celebrated authority does not justify the position, nor does any authority, in this case. The rule applies only where there is ambiguity and doubt. As said at section 473, in the work just mentioned: 'Long usage is no avail against a plain statute; it can be binding only as the interpreter of a doubtful law, and as affording a contemporaneous exposition.' The rule cannot be applied to overthrow an unambiguous mandate of the law. The very growth of the rule sprung from doubtful provisions. In reference to this subject Judge Cooley says: 'Where, however, no ambiguity or doubt appears in the law, we think the same rule applies here as in other cases, that the court should confine its attention to the law and not allow extrinsic circumstances to introduce a difficulty where the language is plain. To allow force to a practical construction in such case would be to suffer manifest perversion to defeat the evident purpose of the lawmakers.' Const. Lim. 84. And in a renowned work by an eminent jurist, it is said: 'Contemporary construction * * * can never abrogate the text; it can never fritter away its obvious sense; it can never narrow down its true limitations; it can never enlarge its natural boundaries.' Story on The Constitution, sec. 407.''

We do not think that the rule we have laid down and as laid down in the quoted portion of the West Virginia case is controverted. The only controversy arises over the question as to whether it applies to this particular case. This theory is discussed in Webster on the Independence of the Judiciary. vol. 3, page 29; People v. Purdy. 2 Hill (N. Y) 35. Cooley's Constitutional Law discusses it quite extensively, and as to the rule there is no dispute.

In the case of Oakley v. Aspinwall, 3 N. Y. 547. Justice Bronson uses the following language:

"It is highly probable that inconveniences will result from following the Constitution as it is written. But that consideration can have no weight with me. It is not for us, but for those who made the instrument, to supply its defects. If the Legislature or the courts may take that office upon themselves, or if, under color of construction, or upon any other specious ground, they may depart from that which is plainly declared, the people may well despair of ever being able to set any boundary to the powers of the government. Written Constitutions will be more than useless. Believing as I do that the success of free institutions depends upon a rigid adherence to the fundamental law, I have never yielded to considerations of expediency in expounding it. * * * My rule has ever been to follow the fundamental law as it is written, regardless of consequences. If the law does not work well, the people can amend it; and inconveniences can be borne long enough to await that process. But if the Legislature or the courts undertake to cure defects by forced and unnatural constructions, they inflict a wound upon the Constitution which nothing can heal. One step taken by the Legislature or the judiciary, in enlarging the powers of the government, opens the door for another which will be sure to follow; and so the process goes on until all respect. for the fundamental law is lost, and the powers of the government are just what those in authority please to call them.''

It has been argued that if the theory of this dissenting opinion is adopted relative to the veto powers of the Governor in appropriation bills with distinct items, this places it within the power of the Legislature to defeat the veto power of the Governor as applied to the appropriation bills by adjourning · immediately after submitting such bills to the Governor. This is no doubt the effect of such interpretation. But it must be borne in mind that it is not a policy that controls in the interpretation of the law or the Constitutions. We at this point desire to reiterate with emphasis that it is the Constitution as written and ratified by the people that controls, and not any theory of what the law should be. This position is stated clearly and emphatically by Justice Bronson in the case of Oakley v. Aspinwall, just cited and quoted.

There is nothing in the Constitution that denies the right of the Legislature to adjourn. The Governor had notice of their intention to adjourn and could have notified them then of his desire to have an opportunity to consider the appropriation bill and requested that they stay in session. But he interpreted the Constitutional provisions as to his power of veto in such a way

that he possesses freedom of action in the exercise of his veto, and, as we contend, his interpretation was wrong as shown by the plain specific language of the Constitution. So, under such a situation, this is no argument.

Since writing the preceding portions of this opinion as to contemporaneous interpretation of section 12 involved in the instant case pertaining to veto of distinct items of appropriation bills, we have made some further investigations. We find that Governor R. L. Williams vetoed certain items in two appropriation bills and in doing so followed the theory suggested by this dissenting opinion. The first one was an appropriation for the University and normal schools, and being House Bill No. 293, found in chapter 65, page 110, Sessions Laws of 1917; the second being appropriation for college fund of state institutions, being House Bill No. 297, chapter 84, page 130, Session Laws of 1917. To each of said bills, as shown in the Session Laws, is a message by Governor Williams addressed to the House of Representatives, the house in which the two bills originated, in which message he quoted section 12, article 6, of our Constitution and disapproved certain items of said bills and stated his reasons for such disapproval. In the first bill disapproved, he seems to disapprove more than one item, and in the second bill disapproved he appears to have disapproved one item. He signed the message to the house pertaining to each bill. "R. L. Williams, Governor of the State of Oklahoma," and after so signing, makes this notation and signed it "R. L. Williams" at the close of each message of disapproval:

"Said item so disapproved was not repassed by a two-thirds vote of the House of Representatives.

"R. L. Williams."

The manner of procedure of Governor Williams in the veto of these two bills indicates by strong implication that the Governor interpreted section 12 to mean that to make his veto effective it was necessary for him to communicate it to the house in which it originated, with his reasons therefor, before adjournment.

When we go to attributing sinister purposes to the various departments of state, we have no more right to attribute these purposes to one department than to another. We can, however, discuss and consider the dangerous effects that might result from this or that holding. The position taken by the Governor as to his powers of veto under the provisions of our Constitution after the adjournment of the Legislature is an assertion of immense power. He claims the power, after the adjournment of the Legislature, to veto any and every provision of an appropriation bill submitted to him in the last hours of the Legislature.

We contend that under the provisions of our Constitution he has no specific grant of such power, neither does he possess it by necessary implication from any provision of our Constitution. Upon the other hand, we hold that the provisions of the Constitution specifically forbid him from exercising such a power. The presumptions all favor the retention of the power in the Legislature and are against any presumptions in favor of the veto power of the Governor.

It has been suggested that, since the Constitution has provided in section 33 of article 5 thereof that no revenue bill shall be passed by the Legislature during the last five days of the session, this is an expression of a policy by the Constitution to deny the right to adjourn immediately after the passage of a general appropriation bill with distinct items and thereby deny the Governor a veto. This is again an application of construction by extrinsic facts, and not interpretation by the plain terms of the Constitution. Section 33 is a specific provision applicable to revenue bills, but the only enactment of the Constitution controlling the Legislature and the Governor regarding appropriation bills containing distinct items is section 12, which we interpret to be plain, clear, and specific, and hence not subject to construction by extrinsic consideration, and its terms should control. To repeat, the Constitution makers had the power to do this, and by the plain terms of the Constitution this has been done, and controls.

Of course, the Constitution makers could have made a provision applicable to an appropriation bill with distinct items the same as they did in section 33 applicable to revenue bills, but they have not done so, and the fact that the Constitution makers have not done so cannot be invoked to support the granting of this enormous power to the Governor by implication in the face of specific provisions contained in section 12, which, by every canon of interpretation, reserves this power to the people and their Legislature, wherein lies the main reservoir of all power. See, in this connection, Fulmore v. Lane, 104 Tex. 511, at page 533, of which an extract reads as follows:

"An effort was made in argument to sustain the Governor on the theory that under

the Constitution he has the right to reduce any part of an item. To this contention and claim, we can never give our assent. If this was conceded, then it would be within the power of the Governor to reduce any appropriation, where the amount sought to be appropriated was not fixed in the Constitution. It would authorize, in respect to the Health Department, to the Controller's Department, our educational institutions, our eleemosynary institutions and every department of the State Government, the Governor —when the Legislature had properly passed on the matter and probably adjourned— might reduce, and tear down the appropriation made for the administration of the affairs of the state in such a way as to beggar and bankrupt all of them and to deny the representatives of the people of the state—the Legislature duly assembled— any authority or participation whatever in the money bills of the commonwealth. Such a proposition involves such intolerable tyranny and hurtful usurpation as not to be entertained for one moment."

Under section 56, article 5, of the Constitution, which we have heretofore quoted, which provides that general appropriation bills shall contain nothing but the expenses of the executives, judicial, and legislative departments of the state and interest on the public debt, taken in connection with other restrictions found in the same section, is indicated an intention on the part of the Constitution makers to place safeguards to meet the emergency of the adjournment of the Legislature. Examination of general appropriation bills shows that the main items making up these appropriations are the salaries of the officers and employes of the various departments which had theretofore been fixed by legislative enactment and were the law of the state. It is true that there are items covering expenses of departments other than salaries that have their initiation in the appropriation bills themselves, but they generally constitute a minor portion of such bills. The item vetoed in the instant case is itself an illustration of this proposition. The position of clerk in the office of the State Examiner and Inspector was first created by an act of the Legislature in its session in 1917, at a salary of $1,200 per year. The Legislature of 1919 re-created that position and fixed the salary therefor at the sum of $1,500 per annum and the same was approved by the Governor April 2, 1919. So it appears that the Governor had approved the policy of creating this office and the amount of the salary, as we show hereinafter in discussing the effect of section 56 of article 5 of the Constitution that the Legislature has not the power under said provision to create

an office, fix the salary thereof, and make an appropriation therefor in a general appropriation bill. This is forbidden by the section of the Constitution we have heretofore cited. So the chances for wild and reckless and inconsiderate appropriation in general appropriation bills is reduced to the minimum by the provisions and restrictions of the Constitution itself.

There is another question that has been raised in this case in the brief of those supporting the contentions of the defendant in error, Norma Rathburn, and that is that the Legislature having created this office, a clerk for the State Examiner and Inspector, and fixing the salary, that constitutes an appropriation by law and that by the Governor vetoing an appropriation for the salary of such offfice that in effect constitutes an abolition of the office itself. We think that this court has already decided this against the contentions of the attorneys for the defendant in error in the case of Meyer, State Auditor, v. Clift, 31 Okla. 793, 123 Pac. 1042. In said opinion, after quoting section 56, article 5, of our Constitution, which article defines what shall be embraced in the general appropriation bill and forbids the increase of salary and creation of offices in an appropriation bill, we quote the following from said opinion, which we think decides this question:

"If an act creating an office and fixing the salary thereof constitutes an appropriation by law, what need is there for that portion of the constitutional provision which prohibits the making of any appropriation in the general appropriation bill for any amount of salary fixed by law prior to the enactment of any such general appropriation bill? If an office has not been established and the salary fixed by an act of the Legislature before the passage of any general appropriation bill, no appropriation to pay the salaries of such office can be made by a general appropriation bill; but it is a fair implication from the provision, if such office is established and the salary fixed by the statute, then an appropriation for the salary may be made in a general appropriation bill. This provision would be meaningless, if the mere establishment of an office and fixing the salary constituted a continuing authority for the payment of the salary out of the treasury of the state; for, in that event, there would be no need of any appropriation for such salaries, either by general bill or a separate appropriation bill."

The effect of the above holding is to hold that creation of an office and the fixing of the salary thereof does not constitute an appropriation, but there must be a separate

appropriation bill directing the payment of the salary of such office. The effect of said section 56, article 5, as interpreted by this opinion, seems to be a wise and wholesome provision since it forbids the loading down of general appropriation bills with newly created offices and the fixing of their salaries and making appropriations therefor; thereby preventing what might otherwise grow into a great evil.

We now come to the close of this dissenting opinion, and we will take the liberty to assert that we, with full confidence, leave the reasons we have advanced in support of our position to speak for themselves.

KENNAMER, J., concurs.