# CHARLESTON.

MAY *v.* TOPPING, *Clerk, etc.*

Submitted April 21, 1909. Decided May 4, 1909.

STATUTES—*Appropriation Bills—Veto—"Disapproval."*

In no event, has the Governor power to disapprove a bill making appropriations of the public money, embracing distinct

items, or to disapprove any item therein, without communicating his disapproval thereof, with his reasons therefor, to the house in which the bill originated before the adjournment of the legislative session. (p. 659.)

Application of Maude May for writ of *mandamus* against C. L. Topping, Clerk of the House of Delegates.

*Peremptory Writ Awarded.*

MOLLOHAN, McCLINTIC & MATHEWS, for petitioner.

WM. G. CONLEY, FRANK LIVELY, and WM. M. O. DAWSON, for respondent.

ROBINSON, JUDGE:

Maude May has applied for a peremptory writ of *mandamus* to compel the Clerk of the House of Delegates of West Virginia, Keeper of the Rolls of the State, to make and deliver to her, upon payment of the fees therefor, a certified copy of House Bill No. 342, entitled "An Act making appropriations of public money to pay general charges upon the Treasury," and to include in such certified copy of that act the following: "To pay to Mrs. Maude May, executrix and devisee, widow of the late Attorney General, Clarke W. May, deceased, the salary for the balance of the year in which said Clarke W. May died, $2,080.00," as one of the acts legally passed by the Legislature of the State of West Virginia and duly enrolled pursuant to law, and also to include in the printed copy of the Acts of the Legislature of 1909, to be published and issued by the Keeper of the Rolls according to law, House Bill No. 342, entitled as aforesaid, containing therein the item appropriating the sum of $2,080.00, as in the words and figures given above, as a valid subsisting act in law, duly passed by the Legislature of the State of West Virginia, according to the provisions of the Constitution. The application for such *mandamus* is resisted by respondent. He maintains that the item appropriating the sum of $2,080.00, in the words and figures recited above, was vetoed by the Governor. He, therefore, presents as his defense that such portion of the bill did not become a law and that he has no power to certify and publish it as such.

The Legislature which passed the bill in question met on Wednesday, the 13th day of January, 1909. It adjourned, by operation of the Constitution, wherein it limits the session to for-

ty-five days, on Friday, the 26th day of February, 1909. The journals of the Senate and House of Delegates, printed by the authority of the respective houses, show that House Bill No. 342 was constitutionally passed by each of them, presented to the Governor and report of such presentation made to each house. The journals further show that a joint committee of the two houses waited upon the Governor, that he directed them to inform the two houses of the Legislature that he had no further communication to make to either of them, that the committee made such report, and that, thereupon, each house adjourned *sine .die.* These printed journals bear the date of Friday, February 26, 1909. They show no extension of the session beyond the constitutional period.

Enrolled House Bill No. 342 was presented to the Governor, as attested by the printed journals of the two houses of the Legislature, on February 26, 1909. It remained in his. possession and control until Friday, the 5th day of March, 1909. At the hour of 8 o'clock A. M., on that day, it was filed in the office of Secretary of State. As presented to the Governor it contained the item of appropriation in favor of Mrs. May. As filed in the office of Secretary of State this item was stricken out by red ink, and there was endorsed on the bill, under the signature of the Governor and the date of March 3, 1909, his disapproval of all items indicated in the bill by red ink erasure, and his approval of all items not so indicated.

. The right of petitioner to the remedy by *mandamus,* invoked to compel the certification and delivery to her of a copy of an act passed by the Legislature and to compel the Keeper of the Rolls to promulgate the same with the other acts passed, has been determined and upheld by this Court in the cases of Capito, Sutherland and Reese, applying for similar writs, at this term. The opinion in those cases is, to further extent, controlling in this case. We need not inquire to what extent. A reference suffices. Aside from the questions therein determined this case involves but one. That question is: Can the Governor veto an item in the general appropriation bill after the adjournment of the Legislature?

The question is, we are of opinion, answered by the plain terms of the Constitution wherein it prescribes that which governs in such cases. Art. 7, sec. 15. This organic constitutional

provision in view of its character and purpose is necessarily mandatory. It provides: "Every bill passed by the Legislature making appropriations of money, embracing distinct items, shall before it becomes a law, be presented to the Governor; if he disapprove the bill, or any item or appropriation therein contained, he shall communicate such disapproval with his reasons therefor to the House in which the bill originated; but all items not disapproved shall have the force and effect of law according to the original provisions of the bill. Any item or items so disapproved shall be void unless re-passed by a majority of each House according to the rules and limitations prescribed in the preceding section in reference to other bills." How is it ordained by this supreme and mandatory law that an item in an appropriation bill embracing distinct items shall be disapproved by the Governor? Plainly is it stated therein that if he disapprove such item he shall communicate such disapproval, with his reasons therefor, to the house in which the bill originated. It is this action of the Governor in communicating such disapproval, with his reasons therefor, to the house in which the bill originated, that consummates and effects a veto of the item. The communication of his disapproval, with his reasons therefor, is the disapproval itself. The obligation upon the Governor to communicate his disapproval of an item, with his reasons therefor, to the house in which the bill originated, is a mandatory one to bring about the qualified veto that is given him in such instances. Unless he communicate as directed by this constitutional provision, he approves and does not disapprove. The last clause of the section clearly discloses such interpretation. It says: "Any item or items so disapproved shall be void, unless re-passed by a majority of each House." What do the words "so disapproved" mean? The use of these words makes one to inquire: *How disapproved?* Clearly they relate not simply to disapproval in the mind of the Governor, but to some act of disapproval, some manner of disapproval. That act or manner of disapproval, provided for just above these words, and to which "so disapproved" clearly relates, is by communication with reasons to the house in which the bill originated. "Any item or items *so disapproved* shall be void, *unless repassed.*" The very connection between the words "so disapproved" and "unless re-passed" show that the Constitution intends that the disapproval of the Governor, to be a disapproval

at all, must be communicated to the house of the Legislature in which the bill originated, so that the Legislature may again act upon the item; so that it may re-pass it, if the Governor's reasons for disapproval do not persuade it to do otherwise, by a majority of each house according to the rules and limitations prescribed. Only by being "so disapproved" is the item declared void by the Constitution. Disapproval in any other form or manner does not affect it.

The plain terms of this constitutional provision should prevail. A Constitution is made for the people and by the people. The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it. "For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be derived at is that of the people, and it is not to be supposed that they have looked for any dark or obstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed." Cooley's Const. Lim. 81. The great Chief Justice Marshall, in the interpretation of a provision of the national Constitution, said: "As men whose intentions require no concealment generally employ the words which most distinctly and aptly express the ideas they intend to convey, the enlightened patriots who adopted it must be understood to have employed words in their natural sense, and to have intended what they said." *Gibbons* v. *Ogden,* 9 Wheat. 188. There is no ambiguity in section 14, of Article 7. It is plain. It needs no construction. The terms used, in common everyday interpretation, can mean nothing but that the Governor disapproves a distinct item in an appropriation bill by communicating his dissent, and his reasons therefor, to the house that originated the bill, so that house may set in motion, if it desire, after hearing the Governor's reasons against the item, legislative action to re-pass the item by a majority of each house. The section plainly contemplates further legislative action, if the Legislature sees fit. Can there be such action after the Legislature has adjourned? The very fact that there cannot be determines that the Governor must express his disapproval before the adjournment.

The people of this State most evidently intended that the sovereign will, the Legislature, should have the ultimate power in the general expenditure of the public revenue. They have so expressed it in the fundamental compact of government. They provided, it is true, a check upon legislative action in this particular by ordaining that the Governor could disapprove the general appropriations and express such disapproval to the Legislature. It was so provided in order that the Executive, versed in statecraft, should advise or reason against the general expenditure of public money, or any item thereof. But the very language of the Constitution in this regard can mean nothing but that, after such reasons against an appropriation are communicated to the Legislature by the Governor, that Legislature, the sovereign body, still has the will to expend the public money notwithstanding the opinion and arguments of the executive head of the State. The people have reserved unto themselves, by their many representatives, embodying the combined and versatile intelligence of the masses, the last word as to the policy and propriety of public expenditures. Such idea is most consistent with the republican form of government. But the people never intended, and it is not so expressed, that the intelligence or will of any one man, in a matter so vital and varied as the expenditure of the public revenue, the very life-blood of the state, should prevail, except by argument, over the combined intelligence and will of their representatives in legislative assembly. "In the multitude of counsellors there is safety."

It has been submitted in the argument that the Court will go far to uphold the veto power of the Governor. We have no power to change the Constitution, and, where that instrument is clear in its terms and of plain interpretation to any ordinary and reasonable mind, there is no room for construction, and it would be mischievous and unlawful to assume it. If the absolute veto power of the Governor was clearly expressed, we should declare its existence. Yet we have nothing to control us other than the plainly written language of the fundamental compact. In that instrument there is nothing to attach us to the idea that the veto power is so sacred that it should be made to prevail, in the face of plain words, against the supreme power of the people. The Governor is not vested with the absolute power of veto. The people have reserved unto themselves in every

event the right and opportunity to accept his disapproval as sound or to overthrow it as not being for the commonweal. We iterate that nowhere in the Constitution is the Governor given the absolute power to prevent a bill that has passed the Legislature from becoming a law, providing that same Legislature, by a majority thereof, sees fit to make that bill a law. During the session every bill presented to the Governor must be returned by him to the house in which it originated, or it becomes a law. During that session he must express his disapproval to the house whence the bill came. The legislative assembly may then by a majority vote still persist in the bill's being a law. True it is, that the legislative assembly may adjourn leaving bills in the hands of the Governor for his disapproval within five days after adjournment, pursuant to Art. 7, sec. 14. But the Legislature has the discretion, the power, to deny to the Governor such absolute opportunity of disapproving legislation. It may so confide in him, or it may not so trust his judgment. It may remain in session for these five days or longer, presenting no bills to the Governor, solely for the purpose of receiving his disapproval of those already presented, and for the further purpose of ratifying or disaffirming any veto that he may make. If the Legislature desires to hold unto itself the power of acting upon the Governor's disapproval of bills, if it does not desire to vest him with absolute veto power as to any bill, it may, five days or more before the day that it would adjourn, complete the legislation for that session, present no more bills to the Governor, and remain in session solely for the purpose of receiving the Governor's disapproval, and of overruling any executive disapproval in the event that it should not meet the sanction of the legislative mind. Or, for the purpose of acting on bills that may be disapproved by the Governor, the Legislature may remain in session after the constitutional period by a concurrence of two-thirds of the members elected to each house. So, most certain it is that the people have not given the absolute power of veto to the Governor. They have reserved unto themselves the ultimate question of the propriety of all legislation. They may, and they do, give such power to him, as to bills other than an appropriation bill embracing distinct items, if the Legislature, representing the people, sees fit to adjourn before the time has expired for executive approval or dis-

approval of all such bills passed. Thus, we see that the legislative, not the executive, will has been made supreme. Then, shall we yield to the argument that the executive will is entitled to the doubt, if any exists, as to which is supreme, in relation to the bill herein involved? Is it not the legislative will in whose favor such doubt should be resolved?

It is insisted upon behalf of respondent that section 14, of Article 7, should be read and applied in connection with section 15 thereof; and that, therefore, the Governor had five days after adjournment to exercise his disapproval by filing the bill with his objections in the office of the Secretary of State. If this were true, the item in the bill in question became a law; because, as we have held in the Capito, Sutherland and Reese cases, it was not filed for more than five days after adjournment. But we cannot read section 14 into section 15. They are distinct. If the provision as to the five days after adjournment was intended to apply to, and be read into, section 15, then why the necessity of the latter section at all? The mere inclusion of a few words in section 14 would have made it fit an appropriation bill embracing distinct items. In reason, we must assume that there was a separate purpose for section 15, and that the section expresses that purpose. The only adoption that section 15 makes from the preceding section is, not as to that portion referring to disapproval within five days after adjournment, but as to the rules and limitations prescribed for the re-passing of a bill after the Governor has disapproved it. And, in that reference of the latter section to the former one, we observe that the promulgators of the Constitution, in effect, refer to section 14 as pertaining to bills other than the one provided for in section 15. The latter section says that the rules and limitations prescribed in the preceding section refer to "other bills." If the rules and limitations in section 14 apply to "other bills," does not the whole of section 14 apply to "other bills?" The clause of section 14 in reference to disapproval within five days after adjournment is not a rule or limitation for the re-passing of a bill. We seek in vain for any tie by which that clause can be connected with the provisions of section 15. There is no rule of construction by which it can be so applied. A distinct section and provision was made relative to executive disapproval of a bill making appropriation of money embracing

distinct items. The Constitution expresses itself in a distinct way as to executive disapproval of a bill making general appropriations of public money. The specific expression of this subject in the latter section is the exclusion of it in the preceding one. In the distinct section no power of disapproval after adjournment is prescribed. Yet in this distinct section it is positively ordained that only items *so disapproved* as therein provided shall be void, unless re-passed. To incorporate the last clause of section 14 would be inconsistent with the use of the clause: "Any item or items so disapproved shall be void, unless re-passed."

We have been cited to the journal of the Constitutional Convention of 1872 showing that section 14, as proposed to the convention, was adopted without change, and that section 15 was materially changed. It is argued that the changes which were made disclose interpretation to be given. It is needless to discuss these changes. There may be force in the argument made upon them. But, as we have hereinbefore said, the interpretation from the language of the provision is plain. The rule which permits a reference to the proceedings of the convention applies only where the meaning of the constitutional provision is doubtful. It cannot, it need not, apply here. Cooley's Const. Lim. 80.

On behalf of respondent, it is maintained, pursuant to allegations of his answer, that it has been the custom of the executive branch of the state government to approve general appropriation bills, or to disapprove some items therein, within five days after an adjournment of the Legislature, and that such action of the executive department has never been questioned. Such custom, if it has existed as alleged, has been directly contrary to the constitutional provision. No affirmative approval of a general appropriation bill is required, and no disapproval of such bill, or any item therein, is effective, if expressed after adjournment. The rule of contemporaneous or practical construction is sought to be invoked. We are cited to Lewis's Sutherland on Statutory Construction, section 472, *et seq.* This celebrated authority does not justify the position, nor does any authority, in this case. The rule applies only where there is ambiguity and doubt. As said at section 473, in the work just mentioned: "Long usage is of no avail against

a plain statute; it can be binding only as the interpreter of a doubtful law, and as affording a contemporary exposition." The rule cannot be applied to overthrow an unambiguous mandate of the law. The very growth of the rule sprung from doubtful provisions. In reference to this subject, Judge Cooley says: "Where, however, no ambiguity or doubt appears in the law, we think the same rule applies here as in other cases, that the court should confine its attention to the law, and not allow extrinsic circumstances to introduce a difficulty where the language is plain. To allow force to a practical construction in such case would be to suffer manifest perversions to defeat the evident purpose of the law makers." Const. Lim. 84. And in a renowned work, by an eminent jurist, it is said: "Contemporary construction * * * * can never abrogate the text; it can never fritter away its obvious sense; it can never narrow down its true limitations; it can never enlarge its natural boundaries." Story on the Constitution, sec. 407.

It is further insisted that since the general appropriation bill was passed during the last hours of the session, the Governor is denied time for consideration, unless the provision for disapproval of a bill after adjournment is made to apply. The legislative journals show that immediately before adjournment the Governor stated to a joint committee that waited upon him that he had no further communication to make to either house. This committee made such report. Must it not be presumed that the Legislature inferred from this that the general appropriation bill was approved? The Governor could have made reply to this committee that he had been given no time for consideration of the appropriation bill. It must be assumed, in reason, fairness, and a recognition of statesmanship, that the Legislature would then have provided for the time that the spirit of the Constitution intends that the Governor shall have. That body certainly would have corrected its fault in postponing the passage of this most vital bill to such late hour of the session. If the situation warranted it, he could have requested that the committee report to the Legislature that if the session was not extended to give him such time he must veto the bill as a whole. He had full power to convene the body the next day in extraordinary session, limiting that session to the consideration of appropriations only. By such action the Leg-

islature would have learned that the Governor meant to have time for consideration, as it was intended he should have, before final adjournment. It was never contemplated that the important matter of appropriating the public money should be left to the very last moments, of a legislative session. Such practice is detrimental to the State and injurious to government. The Legislature should not countenance it. The Executive should stamp it out, even if it must be by the immediate disapproval of a bill passed, at such a late hour, under the pressure of hurried legislative grind. The people rightfully assumed, when the Constitution was adopted, that the provision in reference to presenting bills to the Governor for his disapproval and objection, as well as all other provisions of the compact, would be recognized and respected. It should be so. The Legislature can give the Executive a long time or a short time for consideration of a general appropriation bill. He does not have to return it to the house within five days after it is presented to him, as required in relation to other bills, unless the session would sooner adjourn. But it was surely believed that the legislative and executive branches, in the interest of the masses they represent, would treat each other fairly in such case. However, the failure of the Legislature, or of the Executive, whichever one may be at fault, properly to use the provisions of Article 7, section 15, cannot alter those provisions. The instrument cannot be amended that way. If the Legislature unfairly denied the Governor time, or the Governor erroneously assumed that he had time after adjournment, these are not substantial reasons for changing, by construction, a mandate which means what it says. We repeat, it was reasonably supposed when these provisions were adopted that they would be fairly dealt with, appropriately and usefully applied, and quite as fairly, appropriately and usefully interpreted by those to whom direction is given thereby. That the section has not hitherto received such interpretation and use is no reason why it should not in the future. "Two wrongs cannot make a right." That the provisions of the section would be used to the detriment of the proper consideration of bills by the Governor was never contemplated; that it should be misinterpreted to allow time for disapproval after adjournment was never anticipated. Neither of these ex-

igencies need arise. It is hoped and believed that in the future they will not.

There have been addressed to the Court considerations relating to the merit of the item in question, to the propriety of the alleged veto, and to the effect of the items sought to be vetoed upon the amount of the public revenue available for expenditure. With these questions, this Court has nothing whatever to do. Let the bill, or the item involved in this case, be good or bad, we can concern ourselves with nothing but the question: Is it the legislative will? We can say it is legislation or not legislation, as the case may legally appear; but it is not for us to say that it is good or bad legislation. The policy and propriety of the law rest wholly with the legislative department, subject to the restricted power of disapproval given to the Governor, if exercised by him in proper time.

It appearing that the Governor did not disapprove the item of House Bill No. 342, making the appropriation to petitioner, within the time prescribed by the Constitution, and in the manner therein directed, the writ will be awarded.

*Peremptory Writ Awarded.*