[File No. 6320.]

STATE OF NORTH DAKOTA EX REL. A. M. SANDAKER, Appellant, v. OLE H. OLSON, as Acting Governor, Berta E. Baker as State Auditor, Robert Byrne as Secretary of State, Alfred S. Dale, State Treasurer, and Adam Lefor as State Bank Examiner of The State of North Dakota Comprising The State Auditing Board and Berta E. Baker, as State Auditor of the State of North Dakota, Respondents.

(260 N. W. 586.)

Opinion filed April 9, 1935.   Rehearing denied April 27, 1935.

*Hyland & Fosler* and *W. E. Matthaei,* for appellant.

*P. O. Sathre,* Attorney General, and *Chas. A. Verret,* Assistant Attorney General, for respondent.

Burr, J. The petitioner seeks to mandamus the state auditing board to approve and allow his vouchers for salary as assistant dairy commissioner during the months of July to December, 1933, inclusive, and the state auditor to issue warrants in payment of the same. The vouchers were disapproved and warrants denied on the ground that there is no legislative appropriation made to pay the salary; that the legislature, by chapter 16 of the Session Laws of 1933, made an ap-

propriation for salary for the biennium but this item was vetoed by the governor. The district court denied the writ and petitioner appealed.

Petitioner contends that the veto is void; that in any event chapter 196 of the Session Laws of 1933 fixes the salary of the assistant dairy commissioner at $1350 per year; and also, that prior to the enactment of chapter 43 of the Session Laws of 1915 there was a standing appropriation for the salary of the assistant commissioner, and though such chapter assumes to repeal the appropriation, nevertheless it is unconstitutional as embracing more than one subject.

Chapter 16 of the Session Laws of 1933, in subdiv. 16, made provision for the dairy division of the department of agriculture and labor. This subdiv. contains twelve items. Among the items is the item of $6,960 for assistant dairy commissioners; an item of $3,584 for the salary of the dairy commissioner and other items. This chapter is the general budget for the expenses of the executive, legislative and judicial departments of the state government and for the public schools. It is a general appropriation bill. On March 18, 1933, the Hon. Wm. Langer, governor of the state, approved the bill in part and vetoed, or attempted to veto, certain items. In his veto he stated he struck out from the bill the items for salary of assistant dairy commissioners, for stenographers, for office supplies, etc., vetoed all of the appropriation for the department except the appropriation for dairy commissioner, specifying each item which, as he said was "struck out by me."

It is alleged by the petitioner that while the governor has the constitutional power to veto items in an appropriation bill, he is not authorized to "reduce" an item. It is unnecessary to pass upon this proposition. It is clear from examination of the legislation the governor disapproved these items in toto. He did not reduce, or pare, or scale any of these to make an item less than what the legislature made. He struck out the items entirely.

Section 80 of the Constitution says: "The governor shall have power to disapprove of any item or items, or part or parts of any bill making appropriations of money or property embracing distinct items, and the part or parts of the bill approved shall be the law, and the item or items, and part or parts disapproved shall be void, unless enacted in the following manner: If the legislative assembly be in session he shall transmit to the house in which the bill originated a copy of the item or items,

or part or parts thereof disapproved, together with his objections thereto, and the items or parts objected to shall be separately reconsidered, and each item or part shall then take the same course as is prescribed for the passage of bills over the executive veto." The salary for four dairy commissioners is one of the items in the bill. By striking it out the governor disapproved of it. That is the plain intent of the executive of the state, even if he did not use the term "disapprove." It is true he said the total appropriation was reduced to $3,584 by his act; but this is immaterial. This was merely his answer to a problem in subtraction. The fact is, he disapproved of each of the items in that subdivision except the item of $3,584. The effect of this was to cut the appropriation for that department to $3,584.

However petitioner says these items were not legally and constitutionally vetoed. It is the claim of the petitioner that because § 80 of the Constitution, dealing with the power of the governor to disapprove an item, says: "If the legislative assembly be in session he shall transmit to the house in which the bill originated a copy of the item or items, or part or parts thereof disapproved, together with his objections thereto, and the items or parts objected to shall be separately reconsidered, and each item or part shall then take the same course as is prescribed for the passage of bills over the executive veto."

Therefore, an attempted veto of an item must be made before the legislature adjourns; and that the legislature, by its adjournment, constitutionally prevented the governor from vetoing this item because it made it impossible for him to transmit the disapproved item to the house in which the bill originated, and give the legislature an opportunity to override his veto.

It is clear from the argument, in fact it seems to be conceded, that this appropriation bill did not reach the governor until less than three days prior to the adjournment of the legislature. In other words the governor did not have this appropriation bill presented to him until the time, or about the time, the legislature adjourned so that he did not have "three days (Sundays excepted) to consider the same."

Section 79 of the Constitution says: "If any bill shall not be returned by the Governor within three days (Sundays excepted) after it shall have been presented to him, the same shall be a law unless the legislative assembly, by its adjournment, prevent its return, in which

case it shall be a law unless he shall file the same with his objections, in the office of the secretary of state, within fifteen days after such adjournment." The bill was considered by the executive and items vetoed on March 18, 1933, at 11:50 A. M. within fifteen days after adjournment of the legislature. Ordinarily if he does not veto the bill it becomes a law, even if he does not approve it, except in cases where the legislature adjourns without giving him these three days in which to consider the bill. If the legislature so adjourns then the executive has fifteen days after the adjournment to consider the measure. If he determines to veto the bill, or any item, then he files the bill with his objections in the office of the secretary of state within the period prescribed. This the executive did in the case at bar.

The petitioner says this constitutional provision found in § 79 does not apply to appropriation bills; that the executive control over appropriation bills is limited exclusively to the provision in § 80 of the Constitution, already quoted. We cannot agree with this construction of the two sections. These two §§, 79 and 80, must be taken together, and the purpose is plain. If petitioner's contention is to prevail then the legislature may present a general appropriation bill to the governor five minutes before adjournment, without giving him an opportunity to examine any of the items, and then immediately by adjournment prevent him from vetoing any item, as he could not return it to the legislature for consideration. Clearly it was not the intention of the people, when they adopted the Constitution, to thus limit the power of the executive. Rather it was the intention that in case an appropriation bill was sent to the governor he could disapprove certain provisions thereof and allow the remainder without being required to veto or approve the bill as an entirety. With the general appropriation bill consisting of hundreds of items it was but fair and reasonable that the only items in which the legislature would be interested would be the items disapproved by the executive, and as to these items it could determine whether it would override the veto or sustain it. It will be noted the governor is not required to return the entire appropriation bill to the legislature, when he disapproves items. He merely transmits to the house the item or items which he disapproves.

A controversy seems to arise in the decisions over the meaning of the term "disapprove." In some it seems to be held that this "dis-

approval" is not complete until communicated to the house in which the bill originated. This, however, is too extensive a meaning of the term. A disapproval in our Constitution is a union of intent and act on the part of the executive. It means, as Webster defines it, "to pass unfavorable judgment upon . . . to refuse official approbation to . . . ; to disallow; to decline to sanction." "Disapproval" is an executive act and the evidence of it must be indicated specifically on the bill itself with reference to the particular item or items involved. When the governor has done this he has disapproved the item; but "if the legislative assembly be in session he shall transmit to the house in which the bill originated a copy of the item or items or part or parts thereof disapproved together with his objections thereto." This is the orderly and constitutional method for making disapproval known to the legislative body so that this body may enact into legislation the items disapproved, if it sees fit. However, this can be done only by a two-thirds vote. If the legislature be not in session the governor cannot transmit it to the legislative body. The Constitution does not require an impossible act. The Constitution is plain on this subject. It says the items disapproved shall be void unless reconsidered by the legislature "and each item or part shall then take the same course as is prescribed for the passage of bills over the executive veto." The disapproval by the governor makes the items void; even when communicated to the legislature. If the legislature does nothing they remain void. If the legislature be not in session there is no way for the items to become valid nor to be enacted into legislation. It must not be overlooked that the governor when approving or disapproving items in an appropriation bill is acting in a legislative capacity and not simply as executive.

In addition it may be stated as a matter of historic policy that for decades in this state both the executive and legislative departments of our government—co-ordinating departments with the judiciary—have considered these two sections in practice and have invariably considered that the executive has the right, even after adjournment of the legislature, to veto items in an appropriation bill. Such construction is not to be lightly disregarded. It is a matter of public policy of this state. True, if clearly and plainly opposed to constitutional provisions the lapse of time does not make valid that which would be constitu-

tionally void. Nevertheless, "in construing a constitutional provision or statute, involving questions political or quasi-political in their character, courts will always give great consideration to constructions placed thereon by political departments of the government." O'Laughlin v. Carlson, 30 N. D. 213, 152 N. W. 675; State ex rel. McCue v. Blaisdell, 18 N. D. 31, 119 N. W. 360; State ex rel. Linde v. Packard, 35 N. D. 298, 160 N. W. 150, L.R.A.1917B, 710; State ex rel. Linde v. Robinson, 35 N. D. 417, 160 N. W. 514; State ex rel. Twichell v. Hall, 44 N. D. 459, 171 N. W. 213. In Stong v. People, 74 Colo. 283, 220 P. 999, the court holds that "Long established and uniform executive practice would be persuasive as to proper construction of constitutional provision, though not controlling."

Section 79 of the Constitution says: "Every bill which shall have passed the legislative assembly shall before it becomes a law be presented to the governor." An appropriation bill comes under the provision of § 79. It is a bill which has passed the legislature. It must be presented to the governor so as to give him three days to consider it before adjournment, and if the legislature adjourns without giving this three days' time then the bill is treated the same as any other bill. The governor has fifteen days after adjournment in which to approve or disapprove. Section 80 merely extends the power of the governor over legislation by giving him the right to pick out items and provisions in an appropriation bill which he disapproves. Other bills he must approve or veto in toto; but as to appropriation bills he may veto specific items.

The purpose of § 80 of our Constitution must be apparent and is pointed out in Com. ex rel. Elkin v. Barnett, 199 Pa. 161, 48 A. 976, 55 L.R.A. 882. The purpose is to prevent, if possible, the adoption of omnibus appropriation bills, log rolling, the practice of "jumbling together in one act incongruous subjects in order to force a passage by uniting minorities with different interests when the particular provisions could not pass on their separate merits; with riders of objectionable legislation attached to general appropriation bills in order to force the governor to veto the entire bill and thus stop the wheels of government or approve the obnoxious act." The governor in the exercise of his legislative power could disapprove an item which was obnoxious and

yet permit the proper items to stand. See also Fairfield v. Foster, 25 Ariz. 146, 214 P. 319.

Without this provision in § 80, giving the governor the power to disapprove an item, the governor would be forced to veto the entire appropriation bill and if he did so the whole attempted law would be ineffective under provisions of § 79 of the Constitution. He would be placed in the position of vetoing a bill which contains many items which to him seem necessary and proper, and items which may be clearly obnoxious. He is not compelled to balance the good against the evil for in the provision of § 80 he may disapprove the evil and permit the good to stand.

The Supreme Court of Montana in the case of Mills v. Porter, 69 Mont. 325, 222 P. 428, 35 A.L.R. 592, sets forth in their entirety §§ 12 and 13 of the Montana Constitution which are identical with §§ 79 and 80 of our Constitution, and shows that § 13 (our § 80) was clearly intended to prevent the evil of including in general appropriation bills items which were wholly obnoxious. It then discusses the Montana case in which the governor after the legislature adjournment attempted to veto an item or items or part of an item. While holding the governor had no authority to scale an item it does say, with reference to § 13 of their Constitution (our § 80): "An appropriation bill presented to the governor is made up of a number of items; the governor approves some of the items and disapproves others; the item or items—the part or parts—of the bill approved becomes law, the item or items disapproved are void.

"It is idle to talk of interpreting language so plain, or attempt a 'construction' beyond the clear meaning of the words used by the framers of the Constitution, simply because an exigency has arisen." While holding the governor has no power to "scale" an item it is clear the court had no doubt as to the power of the governor to veto an item in toto even after the legislature adjourned. As to meaning of term "item" see Fairfield v. Foster, supra.

In support of his contention that the governor has no power to veto an item after the adjournment of the legislature petitioner cites the cases of May v. Topping, 65 W. Va. 656, 64 S. E. 848, and Woodall v. Darst, 71 W. Va. 350, 77 S. E. 264, 80 S. E. 367, 44 L.R.A. (N.S.) 83, Ann. Cas. 1914B, 1278. In the latter case the West Virginia court

says: "We have recently decided . . . that the governor is prohibited by the Constitution from vetoing a general appropriation bill,, or any item of it, unless he communicate his reasons therefor to the legislature before its adjournment. The effect of this holding is, that the governor must veto an appropriation bill, or any particular item of it, before the legislature adjourns, or not at all. The legislature may by adjourning immediately after the passage of an appropriation defeat the governor's right to veto."

This quotation is the complete answer to the contention of the petitioner, and shows that the West Virginia Constitution differs quite materially from ours, for it says the Constitution prohibits his veto, etc. While the West Virginia Constitution is interpreted to require the governor to approve or disapprove the appropriation bill before the legislature adjourns, our Constitution in § 80 very clearly does not contemplate this for it says: *"If the legislature be in session* he (the governor) shall transmit . . . the item . . . disapproved." It does not say that if the legislature is not in session he has no authority or control over the bill. It requires him in case of a partial veto to send the bill back to the house in which it originated provided the legislature is in session, just as he is required to do in § 79. If the legislature is not in session he cannot return the bill any more than he can return the bills mentioned in § 79.

An examination of the Constitution of West Virginia shows article 7, § 14, entitled "How Bills Become Law"—to all intents and purposes the same in principle with § 79 of our Constitution, but § 15 of the same article entitled "Respecting Appropriations of Moneys," reads as follows:

"Every bill passed by the Legislature making appropriations of money, embracing distinct items, shall before it becomes a law, be presented to the governor; if he disapproves the bill, or any item or appropriation therein contained, he shall communicate such disapproval with his reasons therefor to the House in which the bill originated; but all items not disapproved shall have the force and effect of law according to the original provisions of the bill. Any item or items so disapproved shall be void, unless repassed by a majority of each House according to the rules and limitations prescribed in the preceding section in reference to other bills."

It will be noted in this section of the West Virginia Constitution that it differs materially from our § 80 in this respect—§ 80 of our Constitution says: "If the legislative assembly be in session he shall transmit to the house in which the bill originated a copy of the item or items disapproved" etc. No such provision appears in the West Virginia Constitution. It is true that in the West Virginia case cited by respondent the Supreme Court of West Virginia says that in the Constitution of that state, the governor must veto an item before the legislature adjourns. How that court would have ruled had the Constitution of that state provided that the items were to be reported if the legislature were in session we cannot say. But it is a significant fact that in another section of the Constitution of West Virginia there is a distinct provision giving authority to the governor to keep the session of the legislature alive until he considers the bill, or he may call a special session for that particular purpose. Subsection D of § 51 of article 6 of the Constitution of West Virginia says: "If the budget bill shall not have been finally acted upon by the legislature three days before the expiration of its regular session the governor may and it shall be his duty to issue a proclamation extending the session for such further period as may in his judgment be necessary for the passage of such bill; but no other matter than such bill shall be considered during such extended session except a provision for the cost thereof."

Further, as pointed out in the West Virginia case of May v. Topping, 65 W. Va. 665, 64 S. E. 848, the governor "had full power to convene the body the next day, in extraordinary session, limiting that session to the consideration of appropriation only." This is § 7 of article 7 of the Constitution. The West Virginia court urges that because of this power of the governor over legislation the legislature had the right to assume the governor did not intend to veto any item and therefore adjourned. Thus by adjournment the legislature prevented the governor from returning the bill to the house with a statement of the items disapproved. Thus our Constitution differs materially from West Virginia in many respects. The report of the governor as to a vetoed item which he is required to make to the house in which the bill originates is simply as to the vetoed items, and not to the entire appropriation bill as in West Virginia. He is not required to file this with the house unless the legislature be in session, whereas there is no such proviso in

the West Virginia Constitution. He does not have the power to extend the session of the legislature to consider the budget bill as West Virginia Constitution provides. One can read on and distinguish the reasons which appeal to the West Virginia court. It is true in the main the West Virginia court does not consider their constitutional provisions similar to provisions in § 79 of our Constitution apply to appropriation bills; but we cannot assent to this view. We must consider the Constitution as a whole and consider the effect which one provision has upon another.

This holding in May v. Topping, etc. is reaffirmed by the same court in Woodall v. Darst, 71 W. Va. 350, 77 S. E. 264, 80 S. E. 367, 44 L.R.A.(N.S.) 83, Ann. Cas. 1914B, 1278. In this last case cited the court recognized the general legislative and executive interpretation of such constitutional provisions saying: "Until recently it was generally supposed that the governor had the power, and the constitutional right, to veto any particular item in the general appropriation bill, within five days after the act was placed in his hands, notwithstanding the legislature may have adjourned before his right of veto could be exercised. Such had been the practice of the governor and of his predecessors in office, and such was their interpretation of the constitutional right of the executive."

In Carter v. Rathburn, 85 Okla. 251, 209 P. 944, we have a case construing a constitutional provision almost identical with the provision construed by the West Virginia court and containing the statements wherein the West Virginia Constitution differs from ours. Section 12 of the Oklahoma Constitution says that any item or items in an appropriation bill disapproved by the governor "shall be void unless repassed by a two-thirds vote, etc." The section makes no reference to whether the legislature be in session at that time, nor does it say what the governor shall do if not in session. The Oklahoma court holds that the effect of a disapproval of an item is to render it void, and as the only constitutional method for making that disapproved item valid is by repassage over the governor's veto such disapproval is still in effect until there be a repassage. The court cannot give it force and effect in the absence of a constitutional provision giving force and effect to the disapproved item. Consequently the Oklahoma court decides that if it be not repassed it still remains void and of no effect, and of course

if the legislature has adjourned in the meantime it cannot be repassed, therefore the disapproved item is of no effect. The Oklahoma court considers and examines the West Virginia cases cited, calls attention to the fact that the West Virginia Constitution is identical with the Oklahoma Constitution and definitely rejects the reasoning and conclusion of the West Virginia court. In the Oklahoma case the court says: "The governor did not disapprove said Senate Bill No. 1 (the appropriation bill under consideration) nor any item therein, nor take any action therein until May 31, 1921, ten days after the day of final adjournment." (209 P. 945.)

The Oklahoma court says: "The Constitution does not expressly say that, unless the governor exercises his disapproval while the legislature is in session, his disapproval will have no effect upon the item in question, nor does it expressly say that any item not disapproved until after adjournment shall become a law. It says 'But all items not disapproved shall have the force and effect of law, . . .' but does not say that any item not disapproved until after the Legislature has adjourned shall have the force and effect of law.

"True, the Constitution says, 'Any item . . . so disapproved shall be void,' and probably true that the phrase 'so disapproved' means disapproved while the legislature is in session, but it does not say that unless it is 'so disapproved' it shall have the force and effect of law; and to give such item the force and effect of law is to do what we think, the Supreme Court of West Virginia did—put life into it by a process of abstract reasoning, rather than by the plain language of the Constitution." See 209 P. 948.

The Oklahoma court again passed upon the principle involved herein and in Peebly v. Childers, 95 Okla. 40, 217 P. 1049, reaffirms the power of the governor to veto an item after the adjournment of the legislature though requiring that the item be approved or disapproved in toto; thus holding that the governor has no authority to reduce an item but must approve it or disapprove it in its entirety. In other words the disapproval to be valid must be a disapproval of the entire item, and this is the situation at bar. The governor disapproved the entire item. The decision then proceeds to pass upon the executive disapproval to an item made ten days after the legislature adjourned. The court holds the governor has not the right to veto a part of an item but indicates

through the entire opinion the constitutional power to veto an item in an appropriation bill, and construes the constitution quite similar in meaning to that of Oklahoma and West Virginia.

We are satisfied the governor's veto or disapproval is in harmony with the requirements of the Constitution.

Petitioner says that chapter 43 of the Session Laws of 1915 is unconstitutional. His argument is that prior to the enactment of this legislation provision was made for assistance in the office of the commissioner of agriculture and labor; that by the provisions of §§ 654, 2837, and other sections of the Compiled Laws of 1913 there were "annually appropriated out of any funds in the state treasury not otherwise appropriated such sums as may be necessary to pay the salaries of the various state officers;" that chapter 43 of the Session Laws of 1915 being the general budget law of that session is "An Act to appropriate money for the Expenses of Executive, Legislative, and Judicial Departments of the State Government and for public schools . . . repealing §§ 141, 155, 652 and 654" and other sections of the Compiled Laws, and that this title is in violation of § 61 of the Constitution which provides:

"No bill shall embrace more than one subject, which shall be expressed in its title, but a bill which violates this provision shall be invalidated thereby only as to so much thereof as shall not be so expressed."

There is little merit in the contention. The statute was enacted as a general budget bill. The subject matter objected to is germane and is intended to be one single subject. This single subject was the appropriations for governmental expense, and the law governs the whole of the general appropriations. Such an act is not invalidated simply because the title may enumerate a plurality of subjects, when all of these subjects taken together are but one subject. See Eaton v. Guarantee Co. 11 N. D. 79, 88 N. W. 1029; State ex rel. Gaulke v. Turner, 37 N. D. 635, 164 N. W. 924; State ex rel. Bismarck Tribune v. Steen, 60 N. D. 627, 634, 236 N. W. 251. This is not a case of the act being broader than the title.

Appellant says chapter 43 of the Session Laws of 1915 violates § 62 of the Constitution which declares: "The general appropriation bill shall embrace nothing but appropriations for the expenses of the execu-

tive, legislative and judicial departments of the state, interest on the public debt, and for public schools. All other appropriations shall be made by separate bills, each embracing but one subject." His argument is that said chapter 43 is a general appropriation bill, and cannot contain any provision except for "appropriations for the expenses of the executive, legislative, and judicial departments of the state, interest on the public debt, and for public schools;" hence that it cannot repeal a law fixing a salary; that therefore § 2837 of the Compiled Laws is still in effect. This § 2837 provides that the assistant dairy commissioner "shall be paid a salary of $1500 per annum."

We need not determine whether § 62 of the Constitution intends to exclude appropriations for special purposes only, and does not purport to exclude repeal of laws affecting fiscal objects; nor need we determine whether chapter 43 of the Session Laws of 1915, by failing to make any reference to an assistant dairy commissioner, affects § 2837 of the Compiled Laws, as chapter 196 of the Session Laws of 1933 specifically affects salaries. This chapter 196 is a statute dealing with salaries, provides that the salary of the "assistant dairy commissioner" shall not exceed $1,350 and specifically repeals "all Acts or parts of Acts in conflict" with the chapter. Section 2837, which fixed the salary at $1,500, is therefore in conflict, and hence is repealed.

The remaining point raised by the petition is that in any event he is entitled to the salary specified in chapter 196 of the Session Laws of 1933, and that this is fixed at $1,350 per annum.

An examination of chapter 196 shows it was enacted by the same legislature which enacted chapter 16, items of which were disapproved by the governor as hereinbefore stated. The title of this act is "An Act fixing the maximum annual and per diem compensation which may be paid to the following named appointive officers," including the assistant dairy commissioners. Section 1 says: "The annual salary or per diem compensation for services rendered in his official capacity by each of the following named appointive officers of the state shall in no case exceed the sum hereinafter set forth opposite his official name. . . ." It specifies the assistant dairy commissioner as one of these appointive officers and states $1,350 opposite his name.

The law does not purport to be an appropriation measure, nor does it fix the salary which the official is to receive. It merely states a

maximum amount beyond which the body fixing the salary is not to go. It nowhere says that such amount is to be paid the officer; but it does say that "if the annual salary . . . of such appointive officer, is, under the laws of this state to be paid out of the general fund of the State from appropriations made therefor by the Legislature, such annual salary . . . shall be in the amount appropriated by the Legislature, but in no event shall the amount appropriated exceed the maximum annual salary . . . hereby established for such officer, . . ."

It is true it may be considered strange that this same legislature should enact such a law setting maximum salaries, and then by legislation in the same session deal with the subject again. It is true that after the legislative assembly set a maximum salary it could change the legislation; but we are not concerned with the wisdom of the statute nor the method involved. The statute does not by its terms fix the salary nor make an appropriation therefor. Clearly the legislature did not intend this to be final, for chapter 16 was enacted which made appropriation for the salaries of "assistant dairy commissioners," without specifying the number. Chapter 196 says the maximum salary shall not exceed $1,350; but this does not fix the salary at that amount, nor attempt to fix it in any amount. The only legislative action affecting the salary is the appropriation for payment found in chapter 16 and this was vetoed by the governor. No act was passed fixing the salary in any sum.

The writ of mandamus was properly denied and the judgment is affirmed.

Burke, Ch. J., and Christianson, Morris and Nuessle, JJ., concur.